SECURITIES AND EXCHANGE COMMISSION *v.*
CAPITAL GAINS RESEARCH BUREAU,
INC., ET AL.

No. 42. Argued October 21, 1963.—
Decided December 9, 1963.

*David Ferber* argued the cause for petitioner. With him on the brief were *Solicitor General Cox, Daniel M. Friedman* and *Philip A. Loomis, Jr.*

*Leo C. Fennelly* argued the cause and filed a brief for respondents.

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

We are called upon in this case to decide whether under the Investment Advisers Act of 1940 [1] the Securities and Exchange Commission may obtain an injunction compelling a registered investment adviser to disclose to his clients a practice of purchasing shares of a security for his own account shortly before recommending that security for long-term investment and then immediately selling the shares at a profit upon the rise in the market price following the recommendation. The answer to this question turns on whether the practice—known in the trade as "scalping"—"operates as a fraud or deceit upon any client or prospective client" within the meaning of the Act.[2] We hold that it does and that the Commission may "enforce compliance" with the Act by obtaining an

---

[1] 54 Stat. 847, as amended, 15 U. S. C. § 80b–1 *et seq.*

[2] 54 Stat. 852, as amended, 15 U. S. C. (Supp. IV) § 80b–6, provides in relevant part that:

"It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

injunction requiring the adviser to make full disclosure of the practice to his clients.[3]

The Commission brought this action against respondents in the United States District Court for the Southern District of New York. At the hearing on the application for a preliminary injunction, the following facts were established. Respondents publish two investment advisory services, one of which—"A Capital Gains Re-

---

"(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

"(3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction. . . ."

[3] 54 Stat. 853, as amended, 15 U. S. C. (Supp. IV) § 80b–9, provides in relevant part that:

"(e) Whenever it shall appear to the Commission that any person has engaged, is engaged, or is about to engage in any act or practice constituting a violation of any provision of this subchapter, or of any rule, regulation, or order hereunder, or that any person has aided, abetted, counseled, commanded, induced, or procured, is aiding, abetting, counseling, commanding, inducing, or procuring, or is about to aid, abet, counsel, command, induce, or procure such a violation, it may in its discretion bring an action in the proper district court of the United States, or the proper United States court of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this subchapter or any rule, regulation, or order hereunder. Upon a showing that such person has engaged, is engaged, or is about to engage in any such act or practice, or in aiding, abetting, counseling, commanding, inducing, or procuring any such act or practice, a permanent or temporary injunction or decree or restraining order shall be granted without bond."

port"—is the subject of this proceeding. The Report is mailed monthly to approximately 5,000 subscribers who each pay an annual subscription price of $18. It carries the following description:

> "An Investment Service devoted exclusively to (1) The protection of investment capital. (2) The realization of a steady and attractive income therefrom. (3) The accumulation of CAPITAL GAINS thru the timely purchase of corporate equities that are proved to be undervalued."

Between March 15, 1960, and November 7, 1960, respondents, on six different occasions, purchased shares of a particular security shortly before recommending it in the Report for long-term investment. On each occasion, there was an increase in the market price and the volume of trading of the recommended security within a few days after the distribution of the Report. Immediately thereafter, respondents sold their shares of these securities at a profit.[4] They did not disclose any aspect of these transactions to their clients or prospective clients.

On the basis of the above facts, the Commission requested a preliminary injunction as necessary to effectuate the purposes of the Investment Advisers Act of 1940. The injunction would have required respondents, in any future Report, to disclose the material facts concerning, *inter alia,* any purchase of recommended securities "within a very short period prior to the distribution of a recommendation . . . ," and "[t]he intent to sell and the sale of said securities . . . within a very short period after distribution of said recommendation . . . ."[5]

---

[4] See Appendix, *infra,* p. 202.

[5] The requested injunction reads in full as follows:

"WHEREFORE the plaintiff demands a temporary restraining order, preliminary injunction and final injunction:

"1. Enjoining the defendants Capital Gains Research Bureau, Inc. and Harry P. Schwarzmann, their agents, servants, employees, at-

The District Court denied the request for a preliminary injunction, holding that the words "fraud" and "deceit" are used in the Investment Advisers Act of 1940 "in their technical sense" and that the Commission had failed to show an intent to injure clients or an actual loss of money to clients. 191 F. Supp. 897. The Court of Appeals for the Second Circuit, sitting *en banc*, by a 5-to-4 vote accepted the District Court's limited construction of "fraud" and "deceit" and affirmed the denial

torneys and assigns, and each of them, while the said Capital Gains Research Bureau, Inc. is an investment adviser, directly and indirectly, by the use of the mails or any means or instrumentalities of interstate commerce from:

"(a) Employing any device, scheme or artifice to defraud any client or prospective client by failing to disclose the material facts concerning

"(1) The purchase by defendant, Capital Gains Research Bureau, Inc., of securities within a very short period prior to the distribution of a recommendation by said defendant to its clients and prospective clients for purchase of said securities;

"(2) The intent to sell and the sale of said securities by said defendant so recommended to be purchased within a very short period after distribution of said recommendation to its clients and prospective clients;

"(3) Effecting of short sales by said defendant within a very short period prior to the distribution of a recommendation by said defendant to its clients and prospective clients to dispose of said securities;

"(4) The intent of said defendant to purchase and the purchase of said securities to cover its short sales;

"(5) The purchase by said defendant for its own account of puts and calls for securities within a very short period prior to the distribution of a recommendation to its clients and prospective clients for purchase or disposition of said securities.

"(b) Engaging in any transaction, practice and course of business which operates as a fraud or deceit upon any client or prospective client by failing to disclose the material facts concerning the matters set forth in demand 1 (a) hereof."

of injunctive relief.[6]   306 F. 2d 606.   The majority concluded that no violation of the Act could be found absent proof that "any misstatements or false figures were contained in any of the bulletins"; or that "the investment advice was unsound"; or that "defendants were being bribed or paid to tout a stock contrary to their own beliefs"; or that "these bulletins were a scheme to get rid of worthless stock"; or that the recommendations were made "for the purpose of endeavoring artificially to raise the market so that [respondents] might unload [their] holdings at a profit."   *Id.,* at 608–609.   The four dissenting judges pointed out that "[t]he common-law doctrines of fraud and deceit grew up in a business climate very different from that involved in the sale of securities," and urged a broad remedial construction of the statute which would encompass respondents' conduct.   *Id.,* at 614.   We granted certiorari to consider the question of statutory construction because of its importance to the investing public and the financial community.   371 U. S. 967.

The decision in this case turns on whether Congress, in empowering the courts to enjoin any practice which operates "as a fraud or deceit upon any client or prospective client," intended to require the Commission to establish fraud and deceit "in their technical sense," including

---

[6] The case was originally heard before a panel of the Court of Appeals, which, with one judge dissenting, affirmed the District Court. 300 F. 2d 745.   Rehearing *en banc* was then ordered.

The Court of Appeals purported to recognize that "federal securities laws are to be construed broadly to effectuate their remedial purpose."   306 F. 2d 606, 608.   But by affirming the District Court's "technical" construction of the Investment Advisers Act of 1940 and by requiring proof of "misstatements," unsound advice, bribery, or intent to unload "worthless stock," the court read the statute, in effect, as confined by traditional common-law concepts of fraud and deceit.

intent to injure and actual injury to clients, or whether Congress intended a broad remedial construction of the Act which would encompass nondisclosure of material facts. For resolution of this issue we consider the history and purpose of the Investment Advisers Act of 1940.

## I.

The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's.[7] It was preceded by the Securities Act of 1933,[8] the Securities Exchange Act of 1934,[9] the Public Utility Holding Company Act of 1935,[10] the Trust Indenture Act of 1939,[11] and the Investment Company Act of 1940.[12] A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.[13] As we recently said in a related context, "It requires but little appreciation . . . of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail"

---

[7] See generally Douglas and Bates, The Federal Securities Act of 1933, 43 Yale L. J. 171 (1933); Loomis, The Securities Exchange Act of 1934 and the Investment Advisers Act of 1940, 28 Geo. Wash. L. Rev. 214 (1959); Shulman, Civil Liability and the Securities Act, 43 Yale L. J. 227 (1933). Cf. Galbraith, The Great Crash (1955).

[8] 48 Stat. 74, as amended, 15 U. S. C. § 77a *et seq.*

[9] 48 Stat. 881, as amended, 15 U. S. C. § 78a *et seq.*

[10] 49 Stat. 838, as amended, 15 U. S. C. § 79 *et seq.*

[11] 53 Stat. 1149, as amended, 15 U. S. C. § 77aaa *et seq.*

[12] 54 Stat. 789, as amended, 15 U. S. C. § 80a–1 *et seq.*

[13] See H. R. Rep. No. 85, 73d Cong., 1st Sess. 2, quoted in *Wilko* v. *Swan*, 346 U. S. 427, 430.

in every facet of the securities industry. *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 366.

The Public Utility Holding Company Act of 1935 "authorized and directed" the Securities and Exchange Commission "to make a study of the functions and activities of investment trusts and investment companies . . . ."[14] Pursuant to this mandate, the Commission made an exhaustive study and report which included consideration of investment counsel and investment advisory services.[15] This aspect of the study and report culminated in the Investment Advisers Act of 1940.

The report reflects the attitude—shared by investment advisers and the Commission—that investment advisers could not "completely perform their basic function—furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments—unless all conflicts of interest between the investment counsel and the client were removed."[16] The report stressed that affiliations by invest-

---

[14] 49 Stat. 837, 15 U. S. C. § 79z–4.

[15] While the study concentrated on investment advisory services which provide personalized counseling to investors, see Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H. R. Doc. No. 477, 76th Cong., 2d Sess., 1 (hereinafter cited as SEC Report) the Senate Committee on Banking and Currency did receive communications from publishers of investment advisory services, see, *e. g.,* Hearings on S. 3580 before Subcommittee of the Senate Committee on Banking and Currency, 76th Cong., 3d Sess., pt. 3 (Exhibits), 1063, and the Act specifically covers "any person who, for compensation, engages in the business of advising others, either directly or through publication or writings . . . ." 54 Stat. 847, 15 U. S. C. § 80b–2.

[16] SEC Report, at 28.

188

ment advisers with investment bankers, or corporations might be "an impediment to a disinterested, objective, or critical attitude toward an investment by clients . . . ."[17]

This concern was not limited to deliberate or conscious impediments to objectivity. Both the advisers and the Commission were well aware that whenever advice to a client might result in financial benefit to the adviser—other than the fee for his advice—"that advice to a client might in some way be tinged with that pecuniary interest [whether consciously or] subconsciously motivated . . . ."[18] The report quoted one leading investment adviser who said that he "would put the emphasis . . . on subconscious" motivation in such situations.[19] It quoted a member of the Commission staff who suggested that a significant part of the problem was not the existence of a "deliberate intent" to obtain a financial advantage, but rather the existence "subconsciously [of] a prejudice" in favor of one's own financial interests.[20] The report incorporated the Code of Ethics and Standards of Practice of one of the leading investment counsel associations, which contained the following canon:

> "[An investment adviser] should continuously occupy an impartial and disinterested position, as free as humanly possible from the *subtle* influence of prejudice, *conscious or unconscious;* he should scrupulously avoid any affiliation, or any act, which subjects his position to challenge in this respect."[21] (Emphasis added.)

Other canons appended to the report announced the following guiding principles: that compensation for investment advice "should consist exclusively of direct

---

[17] *Id.,* at 29.
[18] *Id.,* at 24.
[19] *Ibid.*
[20] *Ibid.*
[21] *Id.,* at 66–67.

charges to clients for services rendered"; [22] that the adviser should devote his time "exclusively to the performance" of his advisory function; [23] that he should not "share in profits" of his clients; [24] and that he should not "directly or indirectly engage in any activity which may jeopardize [his] ability to render unbiased investment advice." [25] These canons were adopted "to the end that the quality of services to be rendered by investment counselors may measure up to the high standards which the public has a right to expect and to demand." [26]

One activity specifically mentioned and condemned by investment advisers who testified before the Commission was *"trading by investment counselors for their own account in securities in which their clients were interested . . . ."* [27]

This study and report—authorized and directed by statute [28]—culminated in the preparation and introduction by Senator Wagner of the bill which, with some changes, became the Investment Advisers Act of 1940.[29] In its "declaration of policy" the original bill stated that

> "Upon the basis of facts disclosed by the record and report of the Securities and Exchange Commission ... it is hereby declared that the national public interest and the interest of investors are adversely affected— . . . (4) when the business of investment advisers is so conducted as to defraud or mislead investors, or to enable such advisers to relieve themselves of their fiduciary obligations to their clients.

---

[22] *Id.,* at 66.

[23] *Id.,* at 65.

[24] *Id.,* at 67.

[25] *Id.,* at 29.

[26] *Id.,* at 66.

[27] *Id.,* at 29–30. (Emphasis added.)

[28] See text accompanying note 14, *supra.*

[29] S. 3580, 76th Cong., 3d Sess.

"It is hereby declared that the policy and purposes of this title, in accordance with which the provisions of this title shall be interpreted, are to mitigate and, so far as is presently practicable to eliminate the abuses enumerated in this section." S. 3580, 76th Cong., 3d Sess., § 202.

Hearings were then held before Committees of both Houses of Congress.[30] In describing their profession, leading investment advisers emphasized their relationship of "trust and confidence" with their clients [31] and the importance of "strict limitation of [their right] to buy and sell securities in the normal way if there is any chance at all that to do so might seem to operate against the interests of clients and the public." [32] The president of the Investment Counsel Association of America, the leading investment counsel association, testified that the

"two fundamental principles upon which the pioneers in this new profession undertook to meet the growing need for unbiased investment information and guidance were, first, that they would limit their efforts and activities to the study of investment problems from the investor's standpoint, not engaging in any other activity, such as security selling or brokerage, which might directly or indirectly bias their investment judgment; and, second, that their remuneration for this work would consist solely of definite, professional fees fully disclosed in advance." [33]

[30] Hearings on S. 3580 before Subcommittee of the Senate Committee on Banking and Currency, 76th Cong., 3d Sess. (hereinafter cited as Senate Hearings). Hearings on H. R. 10065 before Subcommittee of the House Committee on Interstate and Foreign Commerce, 76th Cong., 3d Sess. (hereinafter cited as House Hearings).

[31] Senate Hearings, at 719.

[32] Id., at 716.

[33] Id., at 724.

Although certain changes were made in the bill following the hearings,[34] there is nothing to indicate an intent to alter the fundamental purposes of the legislation. The broad proscription against "any . . . practice . . . which operates . . . as a fraud or deceit upon any client or prospective client" remained in the bill from beginning to end. And the Committee Reports indicate a desire to preserve "the personalized character of the services of investment advisers," [35] and to eliminate conflicts of interest between the investment adviser and the clients [36] as safeguards both to "unsophisticated investors" and to "bona fide investment counsel." [37] The Investment Advisers Act of 1940 thus reflects a congressional recognition "of the delicate fiduciary nature of an investment advisory relationship," [38] as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—

---

[34] The bill as enacted did not contain a section attributing specific abuses to the investment adviser profession. This section was eliminated apparently at the urging of the investment advisers who, while not denying that abuses had occurred, attributed them to certain fringe elements in the profession. They feared that a public and general indictment of all investment advisers by Congress would do irreparable harm to their fledgling profession. See, e. g., Senate Hearings, at 715–716. It cannot be inferred, therefore, that the section was eliminated because Congress had concluded that the abuses had not occurred, or because Congress did not desire to prevent their repetition in the future. The more logical inference, considering the legislative background of the Act, is that the section was omitted to avoid condemning an entire profession (which depends for its success on continued public confidence) for the acts of a few.

[35] H. R. Rep. No. 2639, 76th Cong., 3d Sess. 28 (hereinafter cited as House Report). See also S. Rep. No. 1775, 76th Cong., 3d Sess. 22 (hereinafter cited as Senate Report).

[36] See Senate Report, at 22.

[37] Id., at 21.

[38] 2 Loss, Securities Regulation (2d. ed. 1961), 1412.

consciously or unconsciously—to render advice which was not disinterested. It would defeat the manifest purpose of the Investment Advisers Act of 1940 for us to hold, therefore, that Congress, in empowering the courts to enjoin any practice which operates "as a fraud or deceit," intended to require proof of intent to injure and actual injury to clients.

This conclusion moreover, is not in derogation of the common law of fraud, as the District Court and the majority of the Court of Appeals suggested. To the contrary, it finds support in the process by which the courts have adapted the common law of fraud to the commercial transactions of our society. It is true that at common law intent and injury have been deemed essential elements in a damage suit between parties to an arm's-length transaction.[39] But this is not such an action.[40] This is a

---

[39] See cases cited in 37 C. J. S., Fraud (1943), 210.

Even in a damage suit between parties to an arm's-length transaction, the intent which must be established need not be an intent to cause injury to the client, as the courts below seem to have assumed. "It is to be noted that it is not necessary that the person making the misrepresentations intend to cause loss to the other or gain a profit for himself; it is only necessary that he intend action in reliance on the truth of his misrepresentations." 1 Harper and James, The Law of Torts (1956), 531. "[T]he fact that the defendant was disinterested, that he had the best of motives, and that he thought he was doing the plaintiff a kindness, will not absolve him from liability so long as he did in fact intend to mislead." Prosser, Law of Torts (1955), 538. See 3 Restatement, Torts (1938), § 531, Comment b, illustration 3. It is clear that respondents' failure to disclose the practice here in issue was purposeful, and that they intended that action be taken in reliance on the claimed disinterestedness of the service and its exclusive concern for the clients' interests.

[40] Neither is this a criminal proceeding for "willfully" violating the Act, 54 Stat. 857, as amended, 15 U. S. C. § 80b-17, nor a proceeding to revoke or suspend a registration "in the public interest," 54 Stat. 850, as amended, 15 U. S. C. § 80b-3. Other considerations may be relevant in such proceedings. Compare *Federal Communications Comm'n* v. *American Broadcasting Co.*, 347 U. S. 284.

suit for a preliminary injunction in which the relief sought is, as the dissenting judges below characterized it, the "mild prophylactic," 306 F. 2d, at 613, of requiring a fiduciary to disclose to his clients, not all his security holdings, but only his dealings in recommended securities just before and after the issuance of his recommendations.

The content of common-law fraud has not remained static as the courts below seem to have assumed. It has varied, for example, with the nature of the relief sought, the relationship between the parties, and the merchandise in issue. It is not necessary in a suit for equitable or prophylactic relief to establish all the elements required in a suit for monetary damages.

> "Law had come to regard fraud . . . as primarily a tort, and hedged about with stringent requirements, the chief of which was a strong moral, or rather immoral element, while equity regarded it, as it had all along regarded it, as a conveniently comprehensive word for the expression of a lapse from the high standard of conscientiousness that it exacted from any party occupying a certain contractual or fiduciary relation towards another party." [41]

> "Fraud has a broader meaning in equity [than at law] and intention to defraud or to misrepresent is not a necessary element." [42]

---

[41] Hanbury, Modern Equity (8th ed. 1962), 643. See Letter of Lord Hardwicke to Lord Kames, dated June 30, 1759, printed in Parkes, History of the Court of Chancery (1828), 508, quoted in Snell, Principles of Equity (25th ed. 1960), 496:

"Fraud is infinite, and were a Court of Equity once to lay down rules, how far they would go, and no farther, in extending their relief against it, or to define strictly the species or evidence of it, the jurisdiction would be cramped, and perpetually eluded by new schemes which the fertility of man's invention would contrive."

[42] De Funiak, Handbook of Modern Equity (2d ed. 1956), 235.

> "Fraud, indeed, in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." [43]

Nor is it necessary in a suit against a fiduciary, which Congress recognized the investment adviser to be, to establish all the elements required in a suit against a party to an arm's-length transaction. Courts have imposed on a fiduciary an affirmative duty of "utmost good faith, and full and fair disclosure of all material facts," [44] as well as an affirmative obligation "to employ reasonable care to avoid misleading" [45] his clients. There has also been a growing recognition by common-law courts that the doctrines of fraud and deceit which developed around transactions involving land and other tangible items of wealth are ill-suited to the sale of such intangibles as advice and securities, and that, accordingly, the doctrines must be adapted to the merchandise in issue.[46] The 1909 New York case of *Ridgely* v. *Keene,* 134 App. Div. 647, 119 N. Y. Supp. 451, illustrates this continuing development. An investment adviser who, like respondents, published an investment advisory service, agreed, for compensation, to influence his clients to buy shares in a certain security. He did not disclose the agreement to his client but sought "to excuse his conduct by asserting that . . . he honestly

---

[43] *Moore* v. *Crawford,* 130 U. S. 122, 128, quoting 1 Story, Equity Jur. § 187.

[44] Prosser, Law of Torts (1955), 534–535 (citing cases). See generally Keeton, Fraud—Concealment and Non-Disclosure, 15 Texas L. Rev. 1.

[45] 1 Harper and James, The Law of Torts (1956), 541.

[46] See generally Shulman, Civil Liability and the Securities Act, 43 Yale L. J. 227 (1933).

believed, that his subscribers would profit by his advice . . . ." The court, holding that "his belief in the soundness of his advice is wholly immaterial," declared the act in question "a palpable fraud."

We cannot assume that Congress, in enacting legislation to prevent fraudulent practices by investment advisers, was unaware of these developments in the common law of fraud. Thus, even if we were to agree with the courts below that Congress had intended, in effect, to codify the common law of fraud in the Investment Advisers Act of 1940, it would be logical to conclude that Congress codified the common law "remedially" as the courts had adapted it to the prevention of fraudulent securities transactions by fiduciaries, not "technically" as it has traditionally been applied in damage suits between parties to arm's-length transactions involving land and ordinary chattels.

The foregoing analysis of the judicial treatment of common-law fraud reinforces our conclusion that Congress, in empowering the courts to enjoin any practice which operates "as a fraud or deceit" upon a client, did not intend to require proof of intent to injure and actual injury to the client. Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation "enacted for the purpose of avoiding frauds," [47] not technically and restrictively, but flexibly to effectuate its remedial purposes.

## II.

We turn now to a consideration of whether the specific conduct here in issue was the type which Congress intended to reach in the Investment Advisers Act of 1940.

---

[47] 3 Sutherland, Statutory Construction (3d ed. 1943), 382 *et seq.* (citing cases). See Note, 38 N. Y. U. L. Rev. 985; Comment, 30 U. of Chi. L. Rev. 121, 131–147.

It is arguable—indeed it was argued by "some investment counsel representatives" who testified before the Commission—that any "trading by investment counselors for their own account in securities in which their clients were interested . . ." [48] creates a potential conflict of interest which must be eliminated. We need not go that far in this case, since here the Commission seeks only disclosure of a conflict of interests with significantly greater potential for abuse than in the situation described above. An adviser who, like respondents, secretly trades on the market effect of his own recommendation may be motivated—consciously or unconsciously—to recommend a given security not because of its potential for long-run price increase (which would profit the client), but because of its potential for short-run price increase in response to anticipated activity from the recommendation (which would profit the adviser).[49] An investor seeking the advice of a registered investment adviser must, if the legislative purpose is to be served, be permitted to evaluate such overlapping motivations, through appropriate disclosure, in deciding whether an adviser is serving "two masters" or only one, "especially . . . if one of the masters happens to be economic self-interest." *United States v. Mississippi Valley Co.,* 364 U. S. 520, 549.[50] Accord-

---

[48] See text accompanying note 27, *supra.*

[49] For a discussion of the effects of investment advisory service recommendations on the market price of securities, see Note, 51 Calif. L. Rev. 232, 233.

[50] This Court, in discussing conflicts of interest, has said:

"The reason of the rule inhibiting a party who occupies confidential and fiduciary relations toward another from assuming antagonistic positions to his principal in matters involving the subject matter of the trust is sometimes said to rest in a sound public policy, but it also is justified in a recognition of the authoritative declaration that no man can serve two masters; and considering that human nature must be dealt with, the rule does not stop with actual violations of such

ingly, we hold that the Investment Advisers Act of 1940 empowers the courts, upon a showing such as that made here, to require an adviser to make full and frank disclosure of his practice of trading on the effect of his recommendations.

## III.

Respondents offer three basic arguments against this conclusion. They argue first that Congress could have made, but did not make, failure to disclose material facts unlawful in the Investment Advisers Act of 1940, as it did in the Securities Act of 1933,[51] and that absent specific language, it should not be assumed that Congress intended to include failure to disclose in its general proscription of any practice which operates as a fraud or deceit. But considering the history and chronology of the statutes, this omission does not seem significant. The Securities

---

trust relations, but includes within its purpose the removal of any temptation to violate them. . . .

". . . In *Hazelton* v. *Sheckells*, 202 U. S. 71, 79, we said: 'The objection . . . rests in their tendency, not in what was done in the particular case. . . . The court will not inquire what was done. If that should be improper it probably would be hidden and would not appear.' " *United States* v. *Mississippi Valley Co.*, 364 U. S. 520, 550, n. 14.

[51] 48 Stat. 84, as amended, 15 U. S. C. § 77q (a), provides:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

Act of 1933 was the first experiment in federal regulation of the securities industry. It was understandable, therefore, for Congress, in declaring certain practices unlawful, to include both a general proscription against fraudulent and deceptive practices and, out of an abundance of caution, a specific proscription against nondisclosure. It soon became clear, however, that the courts, aware of the previously outlined developments in the common law of fraud, were merging the proscription against nondisclosure into the general proscription against fraud, treating the former, in effect, as one variety of the latter. For example, in *Securities & Exchange Comm'n v. Torr*, 15 F. Supp. 315 (D. C. S. D. N. Y. 1936), rev'd on other grounds, 87 F. 2d 446, Judge Patterson held that suppression of information material to an evaluation of the disinterestedness of investment advice "operated as a deceit on purchasers," 15 F. Supp., at 317. Later cases also treated nondisclosure as one variety of fraud or deceit.[52] In light of this, and in light of the evident purpose of the Investment Advisers Act of 1940 to substitute a philosophy of disclosure for the philosophy of *caveat emptor*, we cannot assume that the omission in the 1940 Act of a specific proscription against nondisclosure was intended to limit the application of the antifraud and antideceit provisions of the Act so as to render the Commission impotent to enjoin suppression of material facts. The more reasonable assumption, considering what had transpired between 1933 and 1940, is that Congress, in enacting the Investment Advisers Act of 1940 and proscribing

---

[52] See *Archer* v. *Securities & Exchange Comm'n*, 133 F. 2d 795 (C. A. 8th Cir.), cert. denied, 319 U. S. 767; *Charles Hughes & Co.* v. *Securities & Exchange Comm'n*, 139 F. 2d 434 (C. A. 2d Cir.), cert. denied, 321 U. S. 786; *Hughes* v. *Securities & Exchange Comm'n*, 85 U. S. App. D. C. 56, 174 F. 2d 969; *Norris & Hirshberg* v. *Securities & Exchange Comm'n*, 85 U. S. App. D. C. 268, 177 F. 2d 228; *Speed* v. *Transamerica Corp.*, 235 F. 2d 369 (C. A. 3d Cir.).

any practice which operates "as a fraud or deceit," deemed a specific proscription against nondisclosure surplusage.

Respondents also argue that the 1960 amendment [53] to the Investment Advisers Act of 1940 justifies a narrow interpretation of the original enactment. The amendment made two significant changes which are relevant here. "Manipulative" practices were added to the list of those specifically proscribed. There is nothing to suggest, however, that with respect to a requirement of disclosure, "manipulative" is any broader than fraudulent or deceptive.[54] Nor is there any indication that by adding the new proscription Congress intended to narrow the scope of the original proscription. The new amendment also authorizes the Commission "by rules and regulations [to] define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative." The legislative history offers no indication, however, that Congress intended such rules to substitute for the "general and flexible" antifraud provisions which have long been considered necessary to control "the versatile inventions of fraud-doers." [55] Moreover, the intent of Congress must be culled from the events surrounding the passage of

---

[53] 74 Stat. 887, 15 U. S. C. (Supp. IV) § 80b-6 (4).

The amendment, as it is relevant here, made it unlawful for an investment adviser:

"(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."

[54] See, *e. g.,* 48 Stat. 895, as amended, 15 U. S. C. § 78o (c)(1), which refers to such devices "as are manipulative, deceptive, or *otherwise* fraudulent." (Emphasis added.)

[55] *Stonemets* v. *Head,* 248 Mo. 243, 263, 154 S. W. 108, 114. See also note 41, *supra.*

the 1940 legislation. "[O]pinions attributed to a Congress twenty years after the event cannot be considered evidence of the intent of the Congress of 1940." *Securities & Exchange Comm'n* v. *Capital Gains Research Bureau, Inc.*, 306 F. 2d 606, 615 (dissenting opinion). See *United States* v. *Philadelphia Nat. Bank*, 374 U. S. 321, 348–349.

Respondents argue, finally, that their advice was "honest" in the sense that they believed it was sound and did not offer it for the purpose of furthering personal pecuniary objectives. This, of course, is but another way of putting the rejected argument that the elements of technical common-law fraud—particularly intent—must be established before an injunction requiring disclosure may be ordered. It is the practice itself, however, with its potential for abuse, which "operates as a fraud or deceit" within the meaning of the Act when relevant information is suppressed. The Investment Advisers Act of 1940 was "directed not only at dishonor, but also at conduct that tempts dishonor." *United States* v. *Mississippi Valley Co.*, 364 U. S. 520, 549. Failure to disclose material facts must be deemed fraud or deceit within its intended meaning, for, as the experience of the 1920's and 1930's amply reveals, the darkness and ignorance of commercial secrecy are the conditions upon which predatory practices best thrive. To impose upon the Securities and Exchange Commission the burden of showing deliberate dishonesty as a condition precedent to protecting investors through the prophylaxis of disclosure would effectively nullify the protective purposes of the statute. Reading the Act in light of its background we find no such requirement commanded. Neither the Commission nor the courts should be required "to separate the mental urges," *Peterson* v. *Greenville*, 373 U. S. 244, 248, of an investment adviser, for "[t]he motives of man are too com-

plex . . . to separate . . . ." *Mosser* v. *Darrow*, 341 U. S. 267, 271. The statute, in recognition of the adviser's fiduciary relationship to his clients, requires that his advice be disinterested. To insure this it empowers the courts to require disclosure of material facts. It misconceives the purpose of the statute to confine its application to "dishonest" as opposed to "honest" motives. As Dean Shulman said in discussing the nature of securities transactions, what is required is "a picture not simply of the show window, but of the entire store . . . not simply truth in the statements volunteered, but disclosure." [56] The high standards of business morality exacted by our laws regulating the securities industry do not permit an investment adviser to trade on the market effect of his own recommendations without fully and fairly revealing his personal interests in these recommendations to his clients.

Experience has shown that disclosure in such situations, while not onerous to the adviser, is needed to preserve the climate of fair dealing which is so essential to maintain public confidence in the securities industry and to preserve the economic health of the country.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court for proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

---

[56] Shulman, Civil Liability and the Securities Act, 43 Yale L. J. 227, 242.

## APPENDIX TO OPINION OF THE COURT.

On one occasion respondents sold short some shares of a security immediately before stating in their Report that the security was overpriced. After the publication of the Report, respondents covered their short sales. Respondents' transactions are summarized by the Commission as follows:

| Stock | Purchased | Purchase price | Recommended | Sold | Sale price | Profit |
|---|---|---|---|---|---|---|
| Continental Insurance Co. | 3/15/60 | 47¾-47⅞ | 3/18/60 | 3/29/60 | 50⅝ | $1,125.00 |
| United Fruit Co. | 5/13, 16, 19, 20/60 | 21¼-22⅞ | 5/27/60 | 6/6, 7, 9, 10/60 | 23⅝-24½ | 10,725.00 |
| Creole Petroleum Corp. | 7/5, 14/60 | 25¾-28¾ | 7/15/60 | 7/20, 21, 22/60 | 27⅞-29 | 1,762.50 |
| Hart, Schaffner & Marx | 8/8/60 | 23 | 8/12/60 | 8/18, 22/60 | 24⅜-25¼ | 837.00 |
| Union Pacific | 10/28, 31/60 | 25⅜-25⅝ | 11/1/60 | 11/7/60 | 27 | 1,757.00 |
| Frank G. Shattuck Co. | 10/11/60 (purchased calls) | 16.83 (2.53 call cost, plus 14.30 option price) | 10/14/60 | 10/25/60 (exercised calls and sold) | 19½-20⅞ | 695.17 |
| Chock Full O'Nuts | 10/4/60 (sold short) | 68¾-69 (sale price) | 10/14/60 (disparaged) | 10/24/60 (covered short sale) | 62-62⅜ (purchase price) | 2,772.33 |

Although some of the above figures relating to profits are disputed, respondents do not substantially contest the remaining figures.

MR. JUSTICE HARLAN, dissenting.

I would affirm the judgment below substantially for the reasons given by Judge Moore in his opinion for the majority of the Court of Appeals sitting *en banc,* 306 F. 2d 606, and in his earlier opinion for the panel. 300 F. 2d 745. A few additional observations are in order.

Contrary to the majority, I do not read the Court of Appeals' *en banc* opinion as holding that either § 206 (1) of the Investment Advisers Act of 1940, 54 Stat. 847 (prohibiting the employment of "any device, scheme, or artifice to defraud any client or prospective client"), or § 206 (2), 54 Stat. 847 (prohibiting the engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client"), is confined by traditional common law concepts of fraud and deceit. That court recognized that "federal securities laws are to be construed broadly to effectuate their remedial purpose." 306 F. 2d, at 608. It did not hold or intimate that proof of "intent to injure and actual injury to clients" (*ante,* p. 186) was necessary to make out a case under these sections of the statute. Rather it explicitly observed: "Nor can there be any serious dispute that a relationship of trust and confidence should exist between the advisor and the advised," *ibid.,* thus recognizing that no such proof was required. In effect the Court of Appeals simply held that the terms of the statute require, at least, some proof that an investment adviser's recommendations are not disinterested.

I think it clear that what was shown here would not make out a case of fraud or breach of fiduciary relationship under the most expansive concepts of common law or equitable principles. The nondisclosed facts indicate no more than that the respondents personally profited

from the foreseeable reaction to sound and impartial investment advice.[1]

The cases cited by the Court (*ante*, p. 198) are wide of the mark as even a skeletonized statement of them will show. In *Securities & Exchange Comm'n* v. *Torr*, 15 F. Supp. 315, reversed on other grounds, 87 F. 2d 446, defendants were in effect bribed to recommend a certain stock. Although it was not apparent that they lied in making their recommendations, it was plain that they were motivated to make them by the promise of reward. In the case before us, there is no vestige of proof that the reason for the recommendations was anything other than a belief in the soundness of the investment advice given.

*Charles Hughes & Co.* v. *Securities & Exchange Comm'n*, 139 F. 2d 434, involved sales of stock by customers' men to those ignorant of the market value of the stocks at 16% to 41% above the over-the-counter price. Defendant's employees must have known that the customers would have refused to buy had they been aware of the actual market price.

The defendant in *Norris & Hirshberg, Inc.*, v. *Securities & Exchange Comm'n*, 85 U. S. App. D. C. 268, 177 F. 2d 228, dealt in unlisted securities. Most of its customers believed that the firm was acting only on their behalf and that its income was derived from commissions; in fact the firm bought from and sold to its customers, and received its income from mark-ups and mark-downs. The nondisclosure of this basic relationship did not, the court stated,

---

[1] According to respondents' brief (and the fact does not appear to be contested), the annual gross income of Capital Gains Research Bureau from publishing investment information and advice was some $570,000. Even accepting the S. E. C.'s figures, respondents' profit from the trading transactions in question was somewhat less than $20,000. Thus any basis for an inference that respondents' advice was tainted by self-interest, which might have been drawn had respondents' buying and selling activities been more significant, is lacking on this record.

"necessarily establish that petitioner violated the anti-fraud provisions of the Securities and Securities Exchange Acts." *Id.*, at 271, 177 F. 2d, at 231. Defendant's trading practices, however, were found to establish such a violation; an example of these was the buying of shares of stock from one customer and the selling to another at a substantially higher price on the same day. The opinion explicitly distinguishes between what is necessary to prove common law fraud and the grounds under securities legislation sufficient for revocation of a broker-dealer registration. *Id.*, at 273, 177 F. 2d, at 233.

*Arleen Hughes* v. *Securities & Exchange Comm'n*, 85 U. S. App. D. C. 56, 174 F. 2d 969, concerned the revocation of the license of a broker-dealer who also gave investment advice but failed to disclose to customers both the best price at which the securities could be bought in the open market and the price which she had paid for them. Since the court expressly relied on language in statutes and regulations making unlawful "any omission to state a material fact," *id.*, at 63, 174 F. 2d, at 976, this case hardly stands for the proposition that the result would have been the same had such provisions been absent.

In *Speed* v. *Transamerica Corp.*, 235 F. 2d 369, the controlling stockholder of a corporation made a public offer to buy stock, concealing from the other shareholders information known to it as an insider which indicated the real value of the stock to be considerably greater than the price set by the public offer. Had shareholders been aware of the concealment, they would undoubtedly have refused to sell; as a consequence of selling they suffered ascertainable damages.

In *Archer* v. *Securities & Exchange Comm'n*, 133 F. 2d 795, defendant copartners of a company dealing in unlisted securities concealed the name of Claude Westfall, who was found to be in control of the business. Westfall was thereby enabled to defraud the customers of the

brokerage firm of Harris, Upham & Co., for which he worked as a trader. Securities of the customers of the latter firm were bought by defendants' company at under the market level, and defendants' company sold securities to the clients of Harris, Upham & Co. at prices above the market.

In all of these cases but *Arleen Hughes,* which turned on explicit provisions against nondisclosure, the concealment involved clearly reflected dishonest dealing that was vital to the consummation of the relevant transactions. No such factors are revealed by the record in the present case. It is apparent that the Court is able to achieve the result reached today only by construing these provisions of the Investment Advisers Act as it might a pure conflict of interest statute, cf. *United States* v. *Mississippi Valley Co.,* 364 U. S. 520, something which this particular legislation does not purport to be.

I can find nothing in the terms of the statute or in its legislative history which lends support to the absolute rule of disclosure now established by the Court. Apart from the other factors dealt with in the two opinions of the Court of Appeals, it seems to me especially significant that Congress in enacting the Investment Advisers Act did not include the express disclosure provision found in § 17 (a)(2) of the Securities Act of 1933, 48 Stat. 84,[2] even though it did carry over to the Advisers Act the comparable fraud and deceit provisions of the Securities Act.[3]

---

[2] That section makes it unlawful "to obtain money or property by means of . . . any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ."

[3] Section 17 (a) of the 1933 Act makes it unlawful "(1) to employ any device, scheme, or artifice to defraud . . . (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." Compare the language of these provisions with that of § 206 (1), (2) of the Investment Advisers Act, *supra,* p. 203.

To attribute the presence of a disclosure provision in the earlier statute to an "abundance of caution" (*ante,* p. 198) and its omission in the later statute to a congressional belief that its inclusion would be "surplusage" (*ante,* p. 199) is for me a singularly unconvincing explanation of this controlling difference between the two statutes.[4]

However salutary may be thought the disclosure rule now fashioned by the Court, I can find no authority for it either in the statute or in any regulation duly promulgated thereunder by the S. E. C. Only two Terms ago we refused to extend certain provisions of the Securities Exchange Act of 1934 to encompass "policy" considerations at least as cogent as those urged here by the S. E. C. *Blau* v. *Lehman,* 368 U. S. 403. The Court should have exercised the same wise judicial restraint in this case. This is particularly so at this interlocutory stage of the litigation. It is conceivable that at the trial the S. E. C. would have been able to make out a case under the statute construed according to its terms.

I respectfully dissent.

---

[4] The argument is that by the time of enactment of the Investment Advisers Act in 1940 Congress had become aware that the courts "were merging the proscription against nondisclosure [contained in the 1933 Securities Act] into the general proscription against fraud" also found in the same act. *Ante,* p. 198. However, the only federal pre-1940 case cited is *Securities & Exchange Comm'n* v. *Torr, ante,* p. 198, and *supra,* p. 204. There the failure of a fiduciary to disclose that his advice was prompted by a "bribe" was equated by the trial judge with deceit. Such a decision can hardly be deemed to establish that *any* nondisclosure of a fact material to the recipient of investment advice is fraud or deceit. Saying the least, it strains credulity that a provision expressly proscribing material omissions would be thought by Congress to be "surplusage" when it came to enacting the 1940 Act. This is particularly so when it is remembered that violation of the fraud and deceit section is punishable criminally (§ 217 of the Investment Advisers Act of 1940, 54 Stat. 857); Congress must have known that the courts do not favor expansive constructions of criminal statutes.