**15-536**
*United States v. Tagliaferri*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term 2015

(Argued: March 10, 2016       Decided: May 4, 2016)

Docket No. 15-536

UNITED STATES,

*Appellee*,

−v.−

JAMES TAGLIAFERRI, aka Sealed Defendant 1,

*Defendant-Appellant*.

_____

Before:

LEVAL, POOLER, and WESLEY, *Circuit Judges*.

Appeal from a judgment of conviction entered by the United States District Court for the Southern District of New York (Abrams, *J.*). A jury found James Tagliaferri guilty of several securities-related offenses, including criminal violations of section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6. On appeal, Tagliaferri argues, *inter alia*, that the District Court erred in not instructing the jury that investment adviser fraud requires proof of intent to harm his clients. We disagree and accordingly AFFIRM the judgment of the District Court.

———————————

MATTHEW W. BRISSENDEN, Matthew W. Brissenden, P.C., Garden City, NY, *for Defendant-Appellant*.

JASON H. COWLEY, Assistant United States Attorney (Sarah Eddy McCallum, Assistant United States Attorney, *on the brief*), for Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Appellee.*

———————————

PER CURIAM:

Defendant-Appellant James Tagliaferri appeals from a judgment of conviction in the United States District Court for the Southern District of New York (Abrams, *J.*). A jury convicted Tagliaferri on one count of investment adviser fraud, one count of securities fraud, four counts of wire fraud, and six counts of offenses in violation of the Travel Act, 18 U.S.C. § 1952.[1] On appeal, Tagliaferri raises a number of challenges to the sufficiency of the evidence and

---

[1] The jury was unable to reach a verdict on two counts charging wire fraud and a Travel Act violation, and these counts were dismissed on the Government's motion.

1

certain jury instructions. The Court's opinion today addresses only one such challenge: whether a criminal conviction premised on a violation of section 206 of the Investment Advisers Act of 1940 ("the Act"), 15 U.S.C. § 80b-6, requires proof of intent to harm. We conclude that it does not. In a summary order filed herewith, we reject the remainder of Tagliaferri's arguments with respect to his Travel Act, securities fraud, and wire fraud convictions. Accordingly, we affirm the judgment of conviction entered by the District Court.

## BACKGROUND

James Tagliaferri founded Taurus Advisory Group in 1983 as a boutique investment advisory firm located in Stamford, Connecticut. In late 2006, he relocated the firm to the U.S. Virgin Islands and renamed it "TAG Virgin Islands," also called "TAG VI." At this time, Tagliaferri personally had primary investment authority over the vast majority of the managed assets of the firm, which totaled around $252 million among 115 client accounts.

Starting in 2007, Tagliaferri began engaging in three categories of conduct that formed the bases of his convictions.[2] First, in what the Government terms

---

[2] As required when reviewing a motion for judgment of acquittal, we view all evidence in the light most favorable to the Government and draw all permissible inferences in its

the "kickback conduct," Tagliaferri began investing his clients' assets with a Long Island company, International Equine Acquisition Holdings ("IEAH"), that owned and managed racehorses. In return for these investments, IAEH paid Tagliaferri more than $1.7 million in fees, often calculated as a percentage of the client funds invested in IAEH securities. Tagliaferri did not disclose the existence of these payments to his clients—a nondisclosure both contrary to TAG VI's compliance policy and contradictory to a regulatory disclosure statement filed with the U.S. Securities and Exchange Commission ("SEC"), in which Tagliaferri denied receiving any economic benefit from non-clients in connection with client advice. Later, Tagliaferri attempted to recharacterize these transactions: He sent letters to his clients disclosing the fees but describing them as consulting fees for advice rendered to IAEH, sent post-receipt invoices to IAEH listing financial or consulting services, and asked an IAEH employee to alter IAEH's records to indicate the fees were consulting expenses instead of investment banking fees. Tagliaferri also engaged in similar fee arrangements with two brothers, Jason and Jared Galanis, in which he received "referral fees"—not disclosed to his clients—for investments in companies affiliated with

favor, deferring to the jury's resolution of the weight of the evidence and credibility of the witnesses. *See United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011).

3

the brothers and then issued post-receipt invoices describing the payments as advising fees.

Second, in what the Government terms the "cross-trade conduct," Tagliaferri purchased securities from one client's account with another client's assets, sometimes generating fees for himself as described above. Tagliaferri would sometimes sell a client's poorly performing investments to another client, without disclosing to either client that they were engaged in a cross-trade—also a violation of TAG VI's compliance policy. In one instance, Tagliaferri told a client that an overdue note was in escrow and then arranged a series of cross-trade transactions to generate the funds to repay the note obligation.

Third, in what the Government terms the "fake note conduct," Tagliaferri invested over $5 million in a company called National Digital Medical Archive ("NMDA"). Despite its initial characterization as an equity investment, Tagliaferri described it as a loan when clients inquired, later attempting to get NMDA to agree the investment had been a loan. He then created a number of fictitious "sub-notes," which he deposited into the client accounts, notwithstanding that there was no loan agreement or master note promising repayment of the investment. He repeatedly mischaracterized the investments to

4

his clients and, eventually, engaged in cross-trades as described above to pay off clients who demanded payment on the fictitious sub-notes.

The Government arrested and indicted Tagliaferri in February 2013 and, in a superseding indictment the following year, charged him with investment adviser fraud, securities fraud, wire fraud, and multiple violations of the Travel Act. At trial, the defense case primarily rested on Tagliaferri's testimony about how he made his investment decisions and his characterizations of the fees received. He acknowledged that the fees posed a conflict of interest and should have been disclosed to his clients but argued that each investment made was based on his good faith belief that it was in the clients' best interests. While also admitting that the fictitious sub-notes were improper, he maintained that he had always "believed that he would be able to work things out so that his clients would not be harmed." Appellant Br. 17.

At the charging conference, defense counsel argued to the District Court that section 206 of the Act required proof not only of "intent to deceive" but also of "intent to harm." The Government disagreed, arguing that scienter in the context of securities fraud under section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act") requires only an intent to deceive, not to harm, and the Act

is so analogous as to employ the same standard. The District Court accepted the

Government's arguments and made the following charge with respect to intent

to defraud under the Act:

> [T]he government must prove beyond a reasonable doubt . . . that the defendant devised or participated in the alleged device, scheme, or artifice to defraud, or engaged in the allegedly fraudulent transaction, practice, or course of business, knowingly, willfully, and with the specific intent to defraud.
>
> "Knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently.
>
> "Willfully" means to act knowingly and purposely, with an intent to do something the law forbids, that is to say, with bad purpose either to disobey or to disregard the law. The defendant need not have known that he was breaking any particular law or any particular statute. A defendant need only have been aware of the generally unlawful nature of his act. "Intent to defraud" in the context of the securities laws means to act knowingly and with the intent to deceive.
>
> . . .
>
> "[G]ood faith," as I will define that term, on the part of a defendant is a complete defense to a charge of investment adviser fraud.
>
> . . .
>
> In considering whether or not a defendant acted in good faith, however, you are instructed that a belief by the defendant, if such belief existed, that ultimately everything would work out so that no investors would

6

> lose any money or that particular investments would ultimately be financially advantageous for clients does not necessarily constitute good faith. No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by him.

J.A. 283–86. During deliberations, the jury requested clarification on what the phrase "with the specific intent to defraud" meant in the context of investment adviser and securities fraud. J.A. 362. The judge responded by directing their attention to the language of the jury charge that, in the context of investment adviser fraud, specific intent to defraud "means to act knowingly and with intent to deceive." J.A. 357.

Ultimately, the jury convicted Tagliaferri on twelve of the fourteen counts, including the count charging investment adviser fraud. Under the applicable sentencing guidelines, Tagliaferri faced a recommended sentence of 210 to 262 months' incarceration; the District Court entered a judgment sentencing him to seventy-two months.

## DISCUSSION

Section 206 of the Act makes it "unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly

or indirectly" to engage in certain transactions, including "any device, scheme, or artifice to defraud any client or prospective client," "any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client," or "any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6.[3] The Act also authorizes the SEC to enforce its provisions through, *inter alia*, investigation, issuance of subpoenas, actions for injunctions in federal court, and civil damages actions. *See id.* § 80b-9. In addition, the Act imposes criminal penalties on anyone who "willfully violates" its provisions or any SEC rule or regulation promulgated thereunder. *Id.* § 80b-17.

Tagliaferri's principal argument is that, in a criminal prosecution under § 80b-17, section 206 incorporates the common law requirement that intent to defraud includes both intent to deceive *and* intent to harm. *See, e.g.*, *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180–81 (2d Cir. 1970) (holding in the context of wire fraud that intent to defraud requires intent to harm).

---

[3] The Act defines an investment adviser as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities," with certain exceptions not relevant here. 15 U.S.C. § 80b-2(a)(11).

Accordingly, he argues, the District Court erred in declining to instruct the jury that Tagliaferri's intent to harm his clients was a necessary element of the investment adviser charge. We are unpersuaded.[4]

In the context of the SEC's authority to seek a preliminary injunction for conduct violating the Act, *see* § 80b-9(d), the Supreme Court has held that section 206 departs from common law and does not "require proof of intent to injure and actual injury to clients." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963). To require such proof would, the Court held, "defeat the manifest purpose" of the Act: "a congressional recognition of the delicate fiduciary nature of an investment advisory relationship, as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline [an] investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Id.* at 191–92 (footnote and internal quotation marks omitted). The Court relied on not only the legislative history of the Act but also the

_____

[4] "To secure reversal based on a flawed jury instruction, a defendant must demonstrate both error and ensuing prejudice." *United States v. Quinones*, 511 F.3d 289, 313 (2d Cir. 2007). Where, as here, an objection to a jury instruction is properly preserved, we review the instruction *de novo* but will reverse only "'where the charge, viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule.'" *United States v. Binday*, 804 F.3d 558, 580–81 (2d Cir. 2015) (quoting *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009)).

development of common-law fraud itself to impose obligations on fiduciaries, like investment advisers, to act in "utmost good faith, and full and fair disclosure of all material facts." *Id.* at 194 (internal quotation marks omitted). Finally, the Court concluded by noting that the Act, "like other securities legislation enacted for the purpose of avoiding frauds," should be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Id.* at 195 (internal quotation marks omitted).

In an effort to distinguish *Capital Gains*, Tagliaferri relies on the Court's observation that the SEC injunction action was neither "a damages suit between parties to an arm's-length transaction" nor "a criminal proceeding for 'willfully' violating the Act" and that "[o]ther considerations may be relevant in such proceedings." *Id.* at 192 & n.40 (quoting § 80b-17). In doing so, the Court cited to *FCC v. American Broadcasting Co.*, 347 U.S. 284, 296 (1954), in which it applied the rule that "penal statutes are to be construed strictly" to a statute that formed the basis of both civil enforcement actions and criminal prosecutions. Accordingly, Tagliaferri argues, the scope of section 206 in equitable civil enforcement actions, like injunctions under § 80b-9(d), reaches more broadly than it does in criminal prosecutions under § 80b-17. Although this argument is not altogether without

10

force, it goes too far. That "penal statutes are to be construed strictly" may well bar the criminal application of ambiguous statutory terms to facts they do not clearly cover. But this proposition does not imply that a statute providing for criminal enforcement of a civil liability must add an additional essential element. We must therefore consider not only *Capital Gains* but also other relevant precedents. Viewing section 206 in context, we conclude that intent to harm is not an element of a criminal conviction under its terms.

To begin, the only textual distinction between the civil and criminal enforcement mechanisms for section 206 is the Act's requirement that a criminal defendant commit a violation "willfully." § 80b-17. The Supreme Court has observed that while "'willful' is a word of many meanings, its construction often being influenced by its context. . . . [W]hen used in a criminal statute, it generally means an act done with a bad purpose." *Screws v. United States*, 325 U.S. 91, 101 (1945) (internal quotation marks omitted); *see also Bryan v. United States*, 524 U.S. 184, 191 (1998) (holding that "willfully" requires only "that the defendant acted with knowledge that his conduct was unlawful." (internal quotation marks omitted)). Our Court likewise has held in contexts similar to this one that to prove willfulness, "the prosecution need only establish a realization on the

11

defendant's part that he was doing a wrongful act." *United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir. 1976) (Friendly, *J.*) (internal quotation marks omitted); *accord United States v. Kaiser*, 609 F.3d 556, 567–70 (2d Cir. 2010).

Considering both the text of the provision and its statutory context, we cannot say that violating section 206 "willfully" necessarily requires intent to harm one's clients. An investment adviser can violate this provision by engaging in one of four types of conduct: (1) a "device, scheme, or artifice to defraud," (2) a "transaction, practice, or course of business which operates as a fraud or deceit," (3) a knowing sale or purchase of a security to or from a client, while acting on the behalf of someone other than the client (including oneself), without disclosing the transaction and obtaining the client's consent, or (4) an "act, practice, or course of business which is fraudulent, deceptive, or manipulative." § 80b-6. In *Aaron v. SEC*, 446 U.S. 680 (1980), the Supreme Court evaluated section 17(a) of the Securities Exchange Act of 1933 ("the 1933 Act"), which is similarly divided into three subsections. The Court concluded that the language "'any device, scheme, or artifice to defraud' [in the first subsection] plainly evince[d] an intent on the part of Congress to proscribe only knowing or intentional misconduct." *Id.* at 696 (quoting 15 U.S.C. § 77q(a)(1)). The other two

subsections—which prohibited obtaining money or property "'by means of any untrue statement of a material fact or any omission to state a material fact'" and engaging "'in any transaction, practice, or course of business which operates or would operate as a fraud or deceit,'" respectively—contained no indication that *any* intent was required. *See id.* at 696–97 (quoting § 77q(a)(2)–(3)).

Applying a similar textual analysis here, it is clear that, at minimum, subsections (2) and (4) do not incorporate the full requirements of fraudulent intent at common law. Section 206(2) is almost identical to section 17(a)(3) of the 1933 Act. The *Aaron* Court recognized that the language "'*operates or would operate* as a fraud or deceit' quite plainly focuses upon the *effect* of particular conduct on members of the investing public, rather than upon the culpability of the person responsible." 446 U.S. at 697 (emphasis in original). In reaching this interpretation, the *Aaron* Court in fact noted that *Capital Gains* had construed section 206(2)'s similar language as meaning that a showing of "deliberate dishonesty" was not required. *Id.* (citing *Capital Gains*, 375 U.S. at 200). Similarly, section 206(4) prohibits not merely transactions that are "fraudulent" but also those that are "deceptive" or "manipulative." § 80b-6(4). In the context of other securities laws, the language "fraudulent, deceptive, or manipulative"

13

has been construed to reach conduct motivated by either intent to defraud *or* intent to deceive. *See Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 12 (1985); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) ("['Manipulative'] connotes intentional or willful conduct designed to *deceive or defraud* investors by controlling or artificially affecting the price of securities." (emphasis added)). Thus, the reach of section 206(4) extends to practices motivated by intent to deceive, even if not intent to defraud.

Examining the text in conjunction with § 80b-17's requirement of willfulness does not provide any logical reason why willfully "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client," § 80b-6(2), or willfully "engag[ing] in any act, practice, or course of business, which is fraudulent, deceptive, or manipulative," § 80b-6(4), requires specific intent to harm. The former is effect-focused, not intent-focused, and the latter requires, at minimum, intent to deceive. To violate either provision "willfully" is to do so "with a bad purpose," *Screws*, 325 U.S. at 101, or "with knowledge that [such] conduct was unlawful," *Bryan*, 524 U.S. at 191. As *Capital Gains* explained, the Act was designed not only

14

to capture conduct that *was* fraud but also to capture conduct that "*operates* as a fraud." 375 U.S. at 191 (emphasis added).[5]

This conclusion is consistent with both our Circuit's prior holdings and the Supreme Court's explanation of section 206. For example, our Circuit has already applied *Capital Gains*'s reasoning outside the context of equitable injunctions to a civil enforcement action for money damages. *See SEC v. DiBella*, 587 F.3d 553, 567 (2d Cir. 2009) (concluding that "the government need not show intent to make out a [section 206(2)] violation."). In doing so, we relied in some part on the Supreme Court's further explanation of *Capital Gains* in *Aaron*. There, the Supreme Court pointed out that, notwithstanding *Capital Gains*' distinction between equitable and legal fraud, "the language in question in *Capital Gains*, 'any practice which *operates* as a fraud or deceit,' focuses not on the intent of the investment adviser, but rather on the effect of a particular practice." *Aaron*, 446 U.S. at 694 (alterations omitted) (quoting *Capital Gains*, 375 U.S. at 195). Further, "insofar as *Capital Gains* involved a statutory provision regulating the special fiduciary relationship between an investment adviser and his client, the Court

---

[5] Likewise, section 206(3), while requiring knowledge, prohibits certain transactions made without disclosure and obtaining consent—no part of which requires intent to harm. *See* § 80b-6(3).

15

there was dealing with a situation in which intent to defraud would not have been required even in a common-law action for money damages." *Id.*; *see also id.* at 693 (characterizing *Capital Gains* as holding it unnecessary, "in a suit against a fiduciary such as an investment adviser, to establish all the elements of fraud that would be required in a suit against a party to an arm's-length transaction"). *Aaron* ultimately concluded that scienter was an element of section 10(b) of the 1934 Act but not section 206, precisely because the latter had legislative history, statutory text, and the context of a fiduciary relationship cutting against requiring intent. *See id.* at 694–95. As we have just recently made clear that section 10(b) does not require intent to harm, *see United States v. Litvak*, 808 F.3d 160, 178–79 (2d Cir. 2015), it would be inconsistent with *Aaron*'s discussion to conclude that section 206 did.

To summarize, section 206 prohibits not only common-law fraud by investment advisers but also "any practice which operates as a fraud or deceit." *Capital Gains*, 375 U.S. at 192. In the special context of a fiduciary relationship and given the Supreme Court's repeated language in both *Capital Gains* and *Aaron* regarding Congress's intent to reach more than common-law fraud between arms-length parties, it would be inconsistent with the text of section 206

16

and the congressional purpose motivating it to require specific intent to harm. Instead, the willfulness mental state required by § 80b-17 ensures that criminal penalties are limited to cases in which the Government is able to prove that, at minimum, "the defendant acted with knowledge that his conduct was unlawful." *Bryan*, 524 U.S. at 191.[6] Because the wrongfulness of section 206 violations derives from their deceptiveness, proof that the defendant intended to deceive his clients suffices to establish the requisite mens rea for guilt. Accordingly, we find no error in the District Court's instructions to the jury that investment adviser fraud required only intent to deceive and not intent to harm.

---

[6] Tagliaferri asserts, under such an interpretation, his conviction is in violation of due process because the statute would be unconstitutionally vague. We reject this contention easily. A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (internal quotation marks omitted). The statute, as interpreted by the Supreme Court in *Capital Gains* and by us today, criminalizes intentionally deceptive acts or practices by a specific category of individuals—*i.e.*, investment advisers as defined by the Act, *see* § 80b-2(a)(11)—who due to their fiduciary relationships and participation in a highly regulated industry are fully on notice that deceptive conduct is unlawful. The law provides the necessary "explicit standards" that make it "reasonably clear at the relevant time that the defendant's conduct was criminal," though of course it "need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (internal quotation marks omitted); *see also United States v. Persky*, 520 F.2d 283, 287 (2d Cir. 1975) (rejecting vagueness challenge to section 10(b) because "[n]o honest and reasonable citizen could have difficulty in understanding the meaning" of the terms used, notwithstanding the fact that "[a]ll these terms . . . call for interpretation in accordance to the facts of a given case.").

## CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the District Court.