**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**WALL STREET TRANSCRIPT CORPORATION and Richard A. Holman, Defendants.**

**No. 72 Civ. 4664.**

United States District Court, S. D. New York.

May 15, 1978.

Securities and Exchange Commission, Div. of Enforcement, Washington, D. C., for plaintiff; Richard L. Jaeger, Cleveland, Ohio, Wesley A. Gersh, Louisville, Ky., of counsel.

Eaton, Van Winkle & Greenspoon, New York City, for defendants; Samuel N. Greenspoon, New York City, of counsel.

## OPINION

GAGLIARDI, District Judge.

Plaintiff Securities and Exchange Commission ("SEC") has commenced this action against defendants Wall Street Transcript Corporation ("WSTC") and Richard A. Holman pursuant to § 209(e) of the Investment Advisers Act of 1940 ("Investment Advisers Act" or the "Act"), 15 U.S.C. § 80b–9(e). Jurisdiction lies under § 214 of the Act, 15

U.S.C. § 80b–14. The SEC charges these defendants with the violation of § 203(a) of the Act, 15 U.S.C. § 80b–3(a), which makes it unlawful for any "investment adviser" to use any instrumentality of interstate commerce in connection with its business unless it has registered with the SEC, and seeks an injunction requiring the WSTC to register. All parties to the case have moved for summary judgment pursuant to Rule 56, Fed.R. Civ.P. For the reasons stated below, the defendants' motion is granted and the SEC's motion is denied.

### Prior Proceedings

This case turns upon a single legal issue—whether defendant WSTC is an "investment adviser" as defined by § 202(a)(11) of the Investment Advisers Act, 15 U.S.C. § 80b–2(a)(11), which states in pertinent part:

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include . . . (D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation . .

WSTC publishes The Wall Street Transcript ("the *Transcript*"), a weekly tabloid primarily containing verbatim reprints of reports issued by brokerage houses concerning specific securities. In 1967, the SEC ordered an investigation of WSTC pursuant to § 209(a) of the Investment Advisers Act, 15 U.S.C. § 80b–9(a), to determine whether it was acting as an investment adviser in violation of § 203, 15 U.S.C. § 80b–3, the registration provision. When defendant Holman, the sole shareholder and the principal operating officer of WSTC, refused to produce documents or answer questions in response to the SEC's subpoena *duces te-*

*cum,* the SEC applied to the court for enforcement of its subpoena pursuant to § 209(c) of the Act, 15 U.S.C. § 80b–9(c).

The court, per Judge Tyler, refused enforcement. *SEC v. Wall Street Transcript Corp.,* 294 F.Supp. 298 (S.D.N.Y.1968). It concluded that the *Transcript* was a "bona fide newspaper" or "financial publication of general and regular circulation" expressly excluded from the definition of "investment adviser" by § 202(a)(11)(D), 15 U.S.C. § 80b–2(a)(11)(D). Although it acknowledged the existence of a long line of cases holding that a district court must refrain from deciding, on a motion to enforce an administrative subpoena, whether the statute under which the agency purports to act applies to the firm or person against whom the agency is acting, 294 F.Supp. at 303, *citing United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946); *Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943), the court felt that the unique facts of the case before it, including WSTC's "virtually unrebutted showing" that it was entitled to the statutory exclusion, the all-encompassing nature of the subpoena and the First Amendment interests at stake, mandated a prompt decision concerning the Act's coverage. 294 F.Supp. at 307.

The SEC appealed this ruling, and the Court of Appeals for the Second Circuit reversed. *SEC v. Wall Street Transcript Corp.,* 422 F.2d 1371 (2d Cir. 1970). The Court of Appeals held that Judge Tyler, in determining whether the *Transcript* was entitled to the "bona fide newspaper" or "financial publication" exclusion, had given excessive weight to the existence of the "purely formal 'indicia of a newspaper' which [the *Transcript*] exhibits on its face and in the size and nature of its subscription list." 422 F.2d at 1377. Since Congress's objectives in enacting the Investment Advisers Act were "to protect the public and investors against malpractices by persons paid for advising others about securities," *id.* at 1376, *quoting,* [1960] U.S.Code Cong. & Admin.News, pp. 3502, 3503, and

"to expose . . . all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested," 422 F.2d at 1376, *quoting, SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 191–92, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), the "bona fide newspaper" or "financial publication" exclusion was held to be available only to "those publications which do not deviate from customary newspaper activities to such an extent that there is a likelihood that the wrongdoing which the Act was designed to prevent has occurred." 422 F.2d at 1377 (footnote omitted). The commercial practices involved and the financial interests served in the *Transcript's* publication were thus held to be the critical factors to be examined. Whether the *Transcript* was paid for the circulation of material by the brokerage houses whose reports it published and whether the location of those reports was determined on the basis of the editor's news judgment alone were deemed "highly relevant" to the availability of the exclusion.[1] *Id.* at 1378. Consequently, the SEC was empowered to investigate the defendants' commercial operations. The court held, moreover, that the First Amendment did not prohibit such an investigation. 422 F.2d at 1378–81.

After the Supreme Court denied defendants' petition for certiorari, 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970), the investigation proceeded. In 1972, the SEC commenced the instant action for an injunction compelling registration alleging that WSTC was in violation of § 203(a) of the Act. Defendants filed their answer in 1974,[2] denying the principal allegations of the complaint and claiming that WSTC was expressly excluded from the Act's coverage under § 202(a)(11)(D) as the publisher of a "bona fide newspaper, news magazine or business or financial publication of general and regular circulation."[3] Discovery was conducted pursuant to a stipulation between the parties, and it is now complete.[4]

### Statement of Facts

The material facts are not in dispute. WSTC is a New York corporation organized in 1963. Holman is and has been the chief executive officer, director and sole shareholder of WSTC since that date. WSTC's sole business is the weekly publication of the *Transcript,* which is printed in the form of a tabloid newspaper. The *Transcript* is offered to anyone who wishes to purchase it, either by subscription or at the newsstand, but the vast bulk of the weekly circulation of approximately 5,000 copies is sold by annual subscription at a price of $480. These subscriptions are mailed out with second-class mailing privileges. Approximately 40 people are employed by the *Transcript.*

A large percentage of each issue of the *Transcript* is devoted to the reproduction of brokerage house reports, either verbatim or in summary form, on the past performance of and the investment prospects for specific corporations and their securities.[5] These

---

1. The majority's discussion and holding of the relevant criteria for the § 202(a)(11)(D) exclusions was "intended to apply to the statutory exclusion of a financial publication as well as to the newspaper exclusion." 422 F.2d at 1377 n. 8.

2. Defendants initially moved to dismiss the SEC's complaint for failure to state a claim upon which relief could be granted. This court denied that motion in June, 1974.

3. Defendants also alleged that § 203(a) of the Act, as applied to them, was unconstitutional as violative of the First Amendment.

4. Under the terms of the stipulation, each party was permitted to take the depositions of two employees of the opposing party. In addition, the SEC filed responses to defendants' request for admissions and interrogatories. Finally, both parties requested and received limited document production. Apart from the foregoing, no further discovery was sought or had.

5. *These reports and analyses are published in* several distinct sections of the *Transcript*: 1) one having no feature designation, consisting of reports on individual corporations published in their entirety; 2) one entitled "Wall Street Roundup", consisting of summaries of such reports; 3) one entitled "Technical Corner", consisting primarily of reports and charts concerning overall market trends; and 4) one entitled "Options Corner", consisting of summaries

reports generally contain specific buy, sell or hold recommendations. Full attribution is given to both the house and the individual author, if specified in the report, and includes the date on which the report was written, if specified. All reports are publicly circulated by the respective brokerage houses before they are published in the *Transcript.*

Several pages of each issue of the *Transcript* are devoted to the "TWST Roundtable", a verbatim record of a panel discussion among financial analysts moderated by Holman. The discussion generally centers upon the performance of companies within a given industry, and participants often express conflicting views. Full attribution is given to the persons participating in the discussion. Related features, entitled "TWST Interview" or "Who's Who in Profits", frequently appear in the *Transcript* and consist of the verbatim record of an interview, conducted by Holman, of a single individual in the business or financial community with full attribution to the person interviewed. These interviews often address the performance of either a single

corporation or several corporations within an industry.

In a section entitled the "Executive's Corner," the *Transcript* reprints verbatim speeches delivered by corporate executives to financial analyst societies. These speeches generally discuss the recent past performance of the respective corporations and their prospects for future performance.

An occasional feature called the "New Issue Corner" contains information concerning securities issued by corporations making their first public offerings or by established corporations seeking to register a new issue. The information presented is summarized from public documents filed by the issuers with the SEC.[6]

Each issue of the *Transcript* contains an index which lists, by company, the page on which the company is discussed in any of the publication's feature sections. Quarterly and yearly cumulative indices are also included in the appropriate issues. The editorial page of each issue of the *Transcript* carries a lengthy disclaimer.[7] A similar,

---

of broker's views on the option market generally and individual corporate options in particular.

**6.** The *Transcript* devotes small amounts of space to several other features which the SEC does not claim to be investment advice. The "Connoisseur's Corner" discusses investment in antiques and art objects. "Wall-to-Wall Street" collects recent corporate announcements of plans for expansion, acquisition or promotion. The *Transcript* also contains editorials of general interest and a limited number of advertisements.

**7.** The disclaimer reads as follows:

---

NOTE FOR READERS

THE WALL STREET TRANSCRIPT presents news and information to convey helpful, factual information which may include the views, opinions and recommendations of individuals and organizations whose thoughts are deemed of interest. THE WALL STREET TRANSCRIPT does not itself endorse the views of any of these individuals or organizations, give investment advice, act as investment advisor or advocate the purchase or sale of any security or investment.

---

The Wall Street Transcript publishes security reports and comments of others in their entirety as a service to subscribers. The Wall Street Transcript does not in any way endorse or guarantee the accuracy or reliability of any of the information, statements or opinions, expressed in the reports or comments of other firms or individuals. We take due care to report or transcribe accurately what has been written or said by others but because of the possibility of human and mechanical error, we cannot assume any liability for the correctness of the transcription. Errata, when discovered, are corrected. The Wall Street Transcript further points out that in the case of a report published by a broker dealer, there is usually a statement which indicates that the report is not to be considered as an offer to sell or a solicitation of an offer to buy any security; that the material has been obtained from various sources but is not guaranteed as to accuracy or authenticity; that the report does not purport to include all the information available on the mentioned company or companies, as the case may be; that the firm which has written the report may have a position in the securities mentioned and may trade therein from time to time, and, further, that officers, directors or partners of the firm may be directors of or own securities of the company reported upon and may trade therein, and that no

shorter disclaimer is printed above features such as the "TWST Roundtable", the "TWST Interview", and the "Options Corner."

In soliciting subscriptions, the *Transcript* has placed advertisements on the radio and in various publications such as *The New York Times, Barron's, Money* and *The Wall Street Journal.* A frequently used advertising format is the printing of a copy of an index from a recent issue beneath a running headline such as "What's right for you in '68?," "Which should you buy . . . now?," or " '*Must*' Reading for the Market." All of these advertisements make clear that the *Transcript* contains information authored by brokerage houses, financial analysts and corporate executives. In selling and soliciting subscriptions, WSTC utilizes the instrumentalities of interstate commerce.

■ Except for the occasional advertisement in the *Transcript,* the sole revenue defendants receive from publication is from the sale of subscriptions or newsstand copies. The defendants have neither received any compensation from any broker or issuer for publishing a given report or speech, nor acted on behalf of any broker or issuer. They have never reported or published any item for the purpose of affecting the value of any security mentioned therein or of any security owned by them. Indeed, the defendants have never traded in any security mentioned in the *Transcript.* The *Transcript* reports all of the broker's analyses and speeches which it receives or can gather within the limits of the allocable space per issue. If space limitations preclude the publishing of all the reports and analyses collected, defendant Holman, as the publisher and editor, exercises his independent editorial judgment as to which are most newsworthy.[8]

### Discussion

Defendants' initial contention is that even if the Investment Advisers Act did not specifically exclude "bona fide newspapers" from its coverage, the WSTC would not fit within the Act's general definition of "investment adviser" contained in the opening clause of § 202(a)(11). *See supra.* Since the reports and analyses printed in the *Transcript* are initially authored by financial analysts who are not in WSTC's employ and since the *Transcript* disclaims any advocacy of the reports, defendants argue, WSTC neither "engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in . . . securities" nor "issues or promulgates reports concerning securities."

liability of any kind is assumed by the broker dealer which has written the report for the accuracy of the information contained therein. We point out further that, of course, all opinions expressed are subject to change without notice. Neither the information nor any opinion which may be expressed constitutes a solicitation for the purchase or sale of any securities referred to herein.

8. The facts set forth in this paragraph are contained in the affidavit of defendant Holman dated April 14, 1976 and in his deposition dated April 8, 1975. The SEC has neither denied any of these facts nor brought any contravening facts to the court's attention. In its response to defendants' request for admissions, the SEC contends only that it has "no evidence" of any of these practices by the defendants. Rule 56(e), Fed.R.Civ.P., provides that

[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his

response . . . must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

As the Court of Appeals for this Circuit has stated, "[a] party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial, for in doing so he risks the possibility that there will be no trial." *Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir. 1972). *Accord, Applegate v. Top Associates, Inc.,* 425 F.2d 92, 96 (2d Cir. 1970); *Dressler v. MV Sandpiper,* 331 F.2d 130, 132–33 (2d Cir. 1964). The SEC contends that it need not rebut any of the defendants' contentions regarding their commercial practices because they are not material to the issue before the court. (Reply Memorandum, dated April 6, 1977, at pp. 2–3). In light of the Court of Appeals' definition of the criteria for the "bona fide newspaper" exclusion, *see supra,* this conclusion is untenable.

In support of this contention, defendants cite New York cases holding that the publication and sale of books which inform laymen how to draft a will or procure a divorce do not constitute the unlawful practice of law. *New York County Lawyer's Ass'n v. Dacey,* 21 N.Y.2d 694, 287 N.Y.S.2d 422, 234 N.E.2d 459 (1967); *State v. Winder,* 42 A.D.2d 1039, 348 N.Y.S.2d 270 (4th Dep't 1973).

■ Defendants' analogy is obviously inapt. Interpretation of the Investment Advisers Act is clearly a question of federal law which cannot be determined by reference to state policies regarding the protection of laymen. *See SEC v. Wall Street Transcript Corp., supra,* 422 F.2d at 1378 n. 12. As the Court of Appeals has made clear, the Act must be interpreted by reference to the Congressional policy of protecting investors against malpractices by persons paid for advising about securities. *Id.* at 1376–77.

■ There is nothing in the opening clause of § 202(a)(11) which suggests that Congress did not intend to reach those persons who publish investment advice while disavowing any intention to influence investors. The words "advocate", "endorse" or some synonym thereof do not appear in the general definition. Nor does this court think it significant for the purposes of § 202(a)(11)'s opening clause that members of the *Transcript* staff do not author the

material it publishes.[9] The words "author" or "originate" are not part of the section's general definition. If WSTC "issues or promulgates" reports concerning securities or "advises as to the advisability of investing, purchasing, or selling securities," it is irrelevant whether or not it has authored or advocated the advice given. Fulfillment of the Congressional policy of protection against the possibility of personal gain to the publisher from the matter reported cannot hinge upon either the existence of a disclaimer of advocacy or the identity of the author. That a publication acts as a mere conduit for investment advice written by others obviously does not insure against the possibility that the publisher will engage in the fraudulent activities the Act was designed to prevent.[10] WSTC is clearly involved in the business of publishing investment advice for which it is compensated in the form of subscription fees. While it may stretch the language of the statute somewhat to state that WSTC "advises" others about securities, there can be no doubt that, for the purposes of the statute, WSTC "issues" analyses and reports concerning securities. A contrary conclusion would do clear violence to the structure of § 202(a)(11). The "bona fide newspaper" exclusion of § 202(a)(11)(D) would be surplus verbiage unless Congress believed that the general definition of "investment adviser", standing alone, comprised publications which do not purport to advocate invest-

9. *But see* 2 L. Loss, Securities Regulation 1400 (2d ed. 1961) (footnote omitted):

When a broker or dealer thus acts as a conduit for the distribution of reports or analyses prepared by others and charges *more* than the cost and postage, the question whether it is he who "issues or promulgates" the analyses or reports within the meaning of the definition depends on other considerations. If the identity of the author is disclosed and the broker or dealer does not adopt the analyses or reports as his own by adding his own name—for example, when a broker or dealer merely distributes the *Standard and Poor's* reports on specific securities to his customers—he would not seem to be a person who "issues or promulgates" the reports. On the other hand, when the reports, although prepared by a third person, are issued under the sole name of a broker or dealer, he would seem to come within the definition. When he merely adds his own name to that of the author, there is room for argument.

10. Defendants contend that Congress intended to reach only those advisers who bear a direct fiduciary relationship to their clients, citing *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Although the Committee Reports evidence "a desire to preserve 'the personalized character of the services of investment advisers,'" *id.* at 191, 84 S.Ct. at 282, *quoting* H.R. Rep. No. 2639, 76th Cong., 3d Sess. 28, Congress evidently realized that not all investment advisory relationships are of that sort. Section 202(a)(11) applies to those who advise others "either directly or through publications or writings." 15 U.S.C. § 80b–2(a)(11).

ment in securities or which contain information authored by persons other than employees. Many newspapers obviously fit either description. Accordingly, WSTC must register unless it can be shown that it is a "bona fide newspaper, news magazine or business or financial publication of general and regular circulation." 15 U.S.C. § 80b–2(a)(11)(D).

■ The starting point for this inquiry must necessarily be the decision of the Court of Appeals in the prior subpoena enforcement proceeding—the only detailed judicial construction of § 202(a)(11)(D) to date.[11] The SEC minimizes the importance of this prior decision on the ground that the sole issue before the court was the enforceability of the SEC's subpoena. (Reply Memorandum, pp. 16–19). But the defendants' principal defense to the enforcement action was the statutory exclusion for "bona fide newspapers", and the bulk of the court's decision was devoted to defining the parameters of that exclusion.

■ The Court of Appeals held that a publication's entitlement to the "bona fide newspaper" exclusion cannot be determined on the basis of the purely formal "indicia of a newspaper" which it exhibits on its face. 422 F.2d at 1377. Nevertheless, the SEC premises its case against the *Transcript* on just such surface criteria. In effect, the SEC contends that the *Transcript's* emphasis on particular corporations and securities

mandates the conclusion that the defendants' purpose in publishing it, and their subscribers' purpose in purchasing it, is to render and receive investment advice. Merely by reprinting brokers' reports, the SEC argues, the defendants have sufficient opportunity to defraud the *Transcript's* readers to warrant requiring registration.

This opportunity for fraud is substantially mitigated by the *Transcript's* usual practices of reprinting reports and speeches verbatim and giving full attribution to their authors. Verbatim reprinting eliminates the possibility of selective disclosure of a given report's contents, and disclosing the identity of the author permits the prospective investor who reads the *Transcript* to consult the author's brokerage house—which is itself subject to substantial SEC regulation, see 15 U.S.C. §§ 78*o* to 78*o*—3—for further information.[12] Moreover, because the *Transcript* does not print reports until the brokerage houses have circulated them publicly, the defendants' opportunity to engage in "scalping", *i. e.,* purchasing shares for their own account shortly before publishing recommendations and then immediately selling the shares at a profit upon the consequent rise in market price, *See SEC v. Capital Gains Research Bureau, Inc., supra,* 375 U.S. at 181, 84 S.Ct. 275, is minimized.

The principal weakness in the SEC's argument, however, is that it ignores the

11. This court's research has revealed that only one court has had the opportunity to construe this section since the Court of Appeals' decision. In *Person v. New York Post Corp.,* 427 F.Supp. 1297 (E.D.N.Y.1977), plaintiffs claimed that the *New York Post* had violated the Investment Advisers Act. The court rejected this contention stating only that:

> Plaintiffs' own papers herein show that the Post has been published daily except Sunday since it was founded in 1801. And even if that were not the case, such a widely known fact would be a fit subject for judicial notice. The plain truth is that newspapers of general circulation like the Post are not meant to be subject to the Investment Advisers Act and no amount of casuistic ratiocination can make it otherwise.

*Id.* at 1303 (footnotes omitted). Both the SEC and the defendants have reacted to this lack of

precedent by citing judicial definitions of "news" and "newspaper" that have been applied in the context of copyright law, tax law, criminal law and constitutional law. As the Court of Appeals stated, however, "the interpretation of an exclusion of the Investment Advisers Act is not controlled by definitions of 'newspaper' formulated as part of the construction of a different statute with a separate purpose." 422 F.2d at 1378 n. 12.

12. In *FINANCE Magazine,* [1971–1972] Fed. Sec.L.Rep. (CCH) ¶ 78,536, at 81,163 (Oct. 6, 1971), the SEC's Division of Trading and Markets stated that a magazine which contained, *inter alia,* a section referring to the investment merits of specified securities would not be required to register as an investment adviser. The SEC staff noted that all such references were to be properly attributed to their sources.

Court of Appeals's formulation of the crucial issue in this case.

What matters is whether or not a specific publication is engaged in practices which the Act was intended to regulate, such as the offering of professional investment advice without revealing the possibility of personal gain to the publisher from what he reports or how he presents it.

422 F.2d at 1378, *citing SEC v. Capital Gains Research Bureau, Inc., supra.* The SEC does not dispute that the defendants have never received compensation from any party for publishing or positioning a report or speech in the *Transcript*; never published any item for the purpose of affecting the value of any security mentioned therein; never traded in any security mentioned therein. Nor does it dispute that within the limitations of space, the sole determinant of what material is published in the *Transcript* is Holman's independent judgment as to newsworthiness.[13] *See* note 8 *supra.*

On the basis of the undisputed facts before the court, it is clear that the defendants do not engage in practices which the Investment Advisers Act was intended to regulate and that they may avail themselves of the statutory exclusion in § 202(a)(11)(D).[14] The defendants' motion for summary judgment is granted; the SEC's motion for summary judgment is denied.

Let the clerk enter judgment dismissing the complaint.

So Ordered.

---

**13.** The only commercial practice arguably deviating from customary newspaper activity to which the SEC alludes is Holman's 100% stock ownership of WSTC and his full editorial control of the *Transcript*. But these are surely not sufficiently distinctive commercial characteristics to warrant registration in and of themselves.

**14.** Since the court concludes that WSTC may properly avail itself of the "bona fide newspaper" exclusion, the court need not reach defendants' alternative argument that requiring WSTC to register with the SEC would be unconstitutional as violative of the First Amendment. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).