Paul JOHN, individually and as trustee of the Paul L. John Agreement of Trust; Nancy C. John, individually and as trustee of the Nancy C. John Agreement of Trust; and Peggie Hubert, trustee of the Paul L. John Irrevocable Trust established for the benefit of Steven Gregory John and the Paul L. John Irrevocable Trust established for the benefit of Christine Ellen John, Plaintiffs,

v.

SHEARSON/AMERICAN EXPRESS, INC., and J. Gary Morgan, jointly and severally, Defendants.

Civ. A. No. 82–CV–70597–DT.

United States District Court, E.D. Michigan, S.D.

July 26, 1989.

Stephen Wasinger, Norman C. Ankers, Detroit, for plaintiffs.

Bradley J. Schram, Gary M. Saretsky, Bloomfield Hills, for defendants.

## OPINION

### DUGGAN, District Judge.

Plaintiffs brought this action against the defendants herein seeking damages for losses they claim to have suffered as the result of alleged wrongful and fraudulent conduct committed in connection with the purchase and sale of municipal bonds. Plaintiffs seek (1) damages for what they believe is a dimunition in the value of their investments made through, and with, the advice of defendants, (2) for interest plaintiffs believe they are entitled to, but did not receive, and (3) for commissions improperly charged by defendants. Essentially, plaintiffs contend that they suffered the losses as a result of misrepresentations to plaintiff Paul John (hereafter "John") and as a result of defendant Gary Morgan ("Morgan")'s failure to fulfill his duty to adequately disclose to John the risks involved in the investments. Plaintiffs' claims are brought pursuant to federal and state securities law as well as the common law.

For the purpose of this opinion, the Court will consider Paul John ("John") as the plaintiff because it is his involvement with the defendants which resulted in the loss plaintiffs believe they have suffered.

John was president and later Chairman of the Board of Campbell–Ewald Company, a Detroit area advertising agency. A significant portion of his duties at Campbell–Ewald involved the overall responsibility for the General Motors (Chevrolet Division) account. In addition, he was a majority owner in the Little–Page Publishing Company, a business he owned with his wife. As the result of his employment, he obtained stock in Campbell–Ewald. Campbell–Ewald subsequently was acquired and became a subsidiary of Interpublic and John's Campbell–Ewald stock was exchanged for Interpublic stock. At the time of John's receipt of Interpublic stock in 1972, the stock value was approximately $32 per share. The value of Interpublic stock dropped to approximately $8.00 per share in 1974–1975. In 1976, John sold some of the stock and received proceeds of approximately $300,000.

Sometime after the sale of this stock, John had a conversation with a close friend, James Campbell ("Campbell"), who suggested that defendant Morgan might be able to assist John with his investment needs and desires.

In January, 1977, Campbell introduced John to Morgan at a luncheon meeting attended by all three. The trial testimony differed as to exactly what was said at this meeting but it is undisputed that John informed Morgan that he did not want to invest in a "roller coaster" type of investment such as he had been involved in with Interpublic. Morgan recommended investment in muncipal bonds because such investment would meet John's investment objectives, including his desire for tax-free income. In early 1977, John invested $300,-000 (through Morgan) in long-term municipal bonds. In August, 1979, John sold additional shares of Interpublic stock. Plaintiffs claim that such sale was at the suggestion of Morgan. As a result of this sale, John incurred substantial capital gains. Morgan invested this additional $300,000, on behalf of John, in long-term municipal bonds.

In December, 1979, Morgan discussed with John the possibility of a "tax swap". As a result of unusual market conditions in late 1979, municipal bonds, particularly long-term municipal bonds, had declined substantially in value. The "tax swap" was accomplished by transferring the bonds in John's account with similar bonds in another customer's account. In actuality, the bonds from John's account were sold and the bonds from the other customer's account were purchased by John. This resulted in a loss to John of approximately $96,000 which could be (and was) used to offset the capital gain incurred as the result of the sale of Interpublic stock. John contends that he didn't really believe that he suffered any actual loss but only a "paper loss", and that he believed that the full principal of his investment remained intact. Defendants contend that the concept of a "tax swap" was described to John

as early as 1977 with Campbell present because Campbell had engaged previously in a "tax swap". While Morgan believed that the decline in the value of the bonds was only temporary, he denies ever communicating to John that the losses suffered as a result of the "tax swap" were not actual losses.

Defendants supplied John with written information in the first part of 1980, indicating that the loss suffered as the result of the "tax swap" was an actual loss. John testified that he was aware that he had suffered an actual loss in February or March of 1980, when his accountant, while preparing his 1979 tax return, informed him that these "tax swaps" resulted in actual losses. John testified that he then discussed this "actual loss" situation with Morgan but was assured that the market price did not reflect the bonds' true value and that he (John) should not be concerned about the decline in value. Morgan testified that he reasonably believed the bonds had only temporarily declined and that they would rebound when the economy inevitably improved. In the meantime, it is undisputed that John at all times received the interest paid on the face value of the bonds (although plaintiffs contend that as a result of the "tax swap", they received $22,000 less interest than they would have had it not been for the "tax swap.")

In April, 1980, Morgan arranged additional "tax swaps" on behalf of John. John contends that these "tax swaps" were upon the recommendation of Morgan, and generated a loss of approximately $123,-000. This loss together with the loss of approximately $96,000 in December, 1979, resulted in a total realized loss by plaintiff of $220,000.

By August, 1981, John contends, his investment had declined an additional $99,000 (approximate) resulting in a total "loss" suffered by plaintiffs of $319,000. John further contends that in addition to his increasing concern about these "losses", i.e., the reduction in the value of his investments, he also became concerned when he learned that he was being charged commissions for these "tax swaps". John testified

that Morgan had told him that it would cost approximately $150 for the paperwork in conjunction with these "tax swaps". Based on the information that he subsequently received, John concluded that he had actually been charged commissions of $48,000 as a result of these tax swaps. (The evidence discloses that his "conclusion" was incorrect. The Court finds, as a fact, that the commissions charged to him as a result of these "tax swaps"—24 in total—amounted to $24,000.)

Plaintiffs' claim therefore is for the "loss" suffered as a result of the $319,000 decline in the original $600,000 investment, the $22,000 in interest that the plaintiffs claim they should have, but did not, receive, and the $24,000 in commissions which were charged to plaintiffs contrary to the representations made by Morgan. Alternatively, plaintiff seeks a return of the initial $300,000 investment and a "return" of the 6,596 shares of Interpublic stock which was sold "at the suggestion" of Morgan in August, 1979. (Because of a 4 for 1 split, these shares now total 26,384.)

Plaintiffs' claim for damages is brought under a number of theories:

(1) Breach of fiduciary duty;

(2) Violation of Federal Securities Law (Section 10(b) of the 1934 Securities and Exchange Act and Rule 10b–5).

(3) Violation of State Securities Law (M.C.L.A. § 451.810(a)(2));

(4) Common law fraud.

(5) Innocent misrepresentation.

(6) Negligence.

### Finding of Facts

In January, 1977, at the suggestion of Campbell, John met with Campbell and Morgan. John indicated to Morgan that he had $300,000 to invest from the sale of his Interpublic stock and that he wanted an investment that would not fluctuate as did his stock in Interpublic. He also communicated to Morgan that, because of the substantial income he was earning, and the fact that he was in the highest (70%) tax bracket, avoidance of income tax was a

significant investment concern.[1] He communicated to Morgan that he expected the investment to remain intact while he received substantial tax-free income. He had conferred with his friend, Campbell, before meeting with Morgan. Campbell had been involved in "tax swaps" before the initial luncheon in January, 1977. Campbell testified that he was aware of "tax swaps" and that at one luncheon, he told John about "tax swaps". Campbell was aware that municipal bonds could fluctuate in value since he had experienced tax losses as the result of such fluctuation. This Court does not find that Morgan represented to John that these bonds would not fluctuate in value. The Court further finds that Morgan did not knowingly or with a reckless intent to deceive fail to disclose to John that such bonds could fluctuate in value. Morgan did not anticipate the market conditions that took place in late 1979 and 1980 resulting in the substantial decline in value of the bonds; nor did Morgan believe that any usual fluctuation in the market value of the bonds would be of significance to the investment plan of John. Morgan believed that any downward fluctuation in the value of the bonds would not be of significance because John would continue to receive the tax-free interest which was of great importance to him and that he would not suffer an actual loss because the value of the bonds would return before John had any need to dispose of them. John's financial situation was such that it was unlikely that he would need to sell these bonds in the near future. Thus it was anticipated that they would be held for an extended period of time to produce the desired annual tax-free income. John indicated that one of his goals was to have an investment of one million dollars in municipal bonds paying $50,000 in tax-free interest. John testified that his initial investment of $600,000 still produces an annual tax-free income of approximately $41,000.

Even if John were not fully aware of the possible significant fluctuations of long-term municipal bonds at the initial meeting, this Court finds that he became aware of such fluctuations when he learned of the "tax swap" concept from Campbell. While Campbell was not able to recall the exact date of such luncheon, this Court is satisfied that such luncheon took place before the investment of the second $300,000 in August, 1979. The Court bases this finding on Campbell's testimony that he frequently had lunch with John after the initial meeting with Morgan in January, 1977; that he, Campbell, knew about the "tax swaps" before the January, 1977 meeting because he, Campbell, had engaged in them; that he told John that Morgan had a group of investors that did bond "swaps", and that such meeting could have been a "few months later"[2] (than the initial January, 1977 meeting). Campbell later testified that he recalled that the conversation with John about "tax swaps" was probably at the "third meeting" which he believed "would have to have been within a year or something like that". (He later testified he wasn't sure when the meeting took place.) Campbell also testified that he told John that "when the market made sense Gary would make the swap". The obvious purpose of "tax swaps" and discussions relating to "tax swaps" was to point out that losses could be taken on one's tax return, a perceived benefit to the investor.

Morgan was aware that Campbell had knowledge of the fluctuation of the municipal bonds and the tax loss which could result from a "tax swap". He was aware that Campbell had discussed with John, John's investment plans. John acknowledged that, at the initial meeting with John and Campbell, Morgan suggested that John invest in a manner similar to Campbell's investment. Campbell's investment was, of course, in long-term municipal bonds and such investment had fluctuated in value,

---

**1.** John admitted saying to Morgan "... Jesus, man, get me something so I don't have to pay a lot of taxes." John's trial testimony before Judge Woods in June, 1985 in the case of *Campbell v. Shearson/American Express Inc., et al.* (Part of Exhibit 239).

**2.** Since no transcript has been ordered, all references to quoted testimony is from the Court's notes.

allowing for the tax loss taken by Campbell pursuant to the "swaps".

It is undisputed that in December, 1979, John was aware of what he termed a "paper loss" and that in the first part of 1980, he learned from his accountant that in fact, the losses suffered were real losses. The Court finds that, subsequent to the information communicated to him by his accountant regarding the real losses that John conferred with Morgan regarding these losses and Morgan expressed to John his belief that these losses were temporary and that the bonds would return to their original value. This Court does not find that such statements by Morgan were misrepresentations made with intent to deceive John. They were statements by Morgan of his honest belief that the market would recover and that the bonds would return to their original value. Such "optimism" was not ill-founded as it turns out. The testimony of William R. Cole ("Cole"), Branch Manager of Shearson, indicates that as of November, 1988 (when he testified) the bonds had almost returned to "par value". (i.e. their original value of $600,000). Further, John testified during this trial that he would be unwilling to accept the $600,000 for the bonds.

In April, 1980, John agreed to additional "tax swaps". Despite John's knowledge in February or March of 1980, that municipal bonds could diminish significantly (and in fact had), John directed Morgan to purchase additional long-term bonds for his children's trusts in November, 1980. It is difficult for this Court to accept, that, with all the information that John admittedly had, including the information from his accountant, that he continued to believe that these bonds could not fluctuate in value. While he may have shared Morgan's "confidence" that he would be able to obtain the face value of the bonds at such time as he would opt to dispose of them (presumably at some time in the distant future), he nevertheless, had sufficient information so that Morgan's representations did not improperly influence his decision.

John urges upon this Court that he continued to be deceived until August, 1981.

Essentially John contends that he learned from others that Morgan had improperly managed his account and had failed to provide him with all the information to which he was entitled. In support of his claim that Morgan mismanaged his account and failed to provide him with appropriate information to allow him to make knowledgeable decisions, plaintiff called Oliver Slocum, an investment counselor. Slocum criticized Morgan's recommendations to place John in long-term municipal bonds based on Slocum's understanding that John did not want any risk, fluctuation or volatility. He did not feel that the municipal bonds which Morgan purchased for John were appropriate, even for one who wanted tax-free income during his retirement. While he did not subscribe to the philosophy of placing individuals such as John into long-term municipal bonds, he acknowledged that some brokers did share Morgan's philosophy that interest rates and yields were high in 1979 and that it was a good time to purchase long-term bonds. In evaluating Slocum's testimony, this Court considers Slocum's admission that when he analyzed John's portfolio and was critical of Morgan's management of the account, he (Slocum) hoped to bring John's portfolio to his company.

Defendants called Bruce Coleman, Vice-President of Michigan National Bank in charge of its bond department. Coleman previously served as Head Municipal Bond Trader at William C. Roney & Co. He testified that the recommendations of long-term municipal bonds was an appropriate recommendation. He further testified that while there is some increased volatility in a long-term bond vs. a short-term bond, the increased income from the long-term bond will offset, to some degree, the added volatility of the long-term bond. He testified that all issues John purchased were of institutional investment quality and that the fluctuations in the value of the bond were the result of market conditions, not the result of the quality of the bonds. This Court having examined the qualifications of both Slocum and Coleman, does hereby accept the testimony of Coleman that it was not inappropriate for Morgan to rec-

ommend to John the purchase of long-term municipal bonds as a means of fulfilling John's long-term investment purposes, including a desire for tax-free income.

While there are many factors involved in investing that a lay person such as John may not be expected to know, such as how the broker is compensated on initial issues of bonds; what commissions are charged generally; the significance of the spread in interest between long-term bonds and short-term bonds; how the "yield to maturity" is computed, etc., the only information which John should have possessed (but claims he didn't) which is material to the decision in this case is the information relating to the potential for fluctuation of municipal bonds and the information relating to the actual commission to be charged John for the "tax swaps". As previously indicated, Morgan had a duty to be reasonably certain that John was aware of the risks involved in investing in municipal bonds. The normal risks involved in investing in municipal bonds is that there will be *some* fluctuation in value as interest rates rise or fall. The Court finds, from the testimony offered, that the municipal bonds involved here were second in quality only to U.S. government bonds and that at the time the bonds were purchased, Morgan had no reason to believe that there would be any significant long-term decline in the value of these bonds. In other words, Morgan believed that these bonds were relatively stable and that if there was a downward fluctuation, it would be temporary and of no consequence to an investor, such as John, who likely would not need to sell these bonds during any temporary decline in value. This Court does not believe that Morgan anticipated, nor was he expected to anticipate, the unusual effect on the market that took place during late 1979 and 1980 as a result of unanticipated inflation and soaring interest rates. This Court is satisfied that Morgan believed both from his conversations with John and his conversations with John and Campbell, and because of his knowledge of the friendship between John and Campbell, that John was, in fact, aware of the fact that there might be some fluctuations in the values of these bonds. In this Court's opinion, such knowledge that there might be some fluctuation in the value of the bonds, although possessed by both John and Morgan, was not of significance to either John or Morgan because it was not anticipated that any fluctuations that might occur would adversely affect John, who was investing for a long-term with an important objective of obtaining tax-free income.

As previously stated, this Court also believes that John was aware of the potential for significant fluctuations in the bond market and, relatedly, the tax losses resulting from the "swaps" before the second investment in August, 1979. It is undisputed that he was aware of the decline in value in December, 1979. Despite the knowledge acquired from his accountant in early 1980, that these were *actual* losses, John urges upon this Court that he continued to believe such losses were only "paper losses". He may have honestly believed that. And he may have honestly believed when he learned about the "tax swaps" from Campbell, that these were only "paper losses". But he certainly should have realized when he was deducting these losses from his income that there had to be some "reality" to these losses in order to justify the tax deduction. Nevertheless, he contends that even after he had taken these losses as deductions on his tax return, he believed they were "paper losses". This Court accepts the fact that he could consider these only "paper losses" in the sense that he believed the replacement bonds would increase his investment to its original value. Morgan shared this view. This Court does not believe, however, that John lacked sufficient information to enable him to make appropriate judgments.

In this Court's opinion, he was not misled by any failure of Morgan to convey to him information which he, John, did not already possess; nor was he misled by any false statements or misrepresentations made to him by Morgan. John's subsequent conduct confirms this Court's conclusion. John admits that in 1981, he was fully aware of the significance of investing in long-term municipal bonds, *i.e.*, both the

advantages and disadvantages, yet he did not choose to divest himself of these investments. Presumably, he believed that it was financially unwise to sell at that time because he expected that the value of the bonds would increase. Based on the testimony at trial, this judgment appears to be a correct one since, as previously indicated, as of the time of trial, his investment had returned essentially to its original value.

In evaluating whether or not Morgan acted properly, this Court considers, not only whether Morgan failed to disclose material facts to John (or made misrepresentations), but whether or not Morgan fulfilled the fiduciary duty owed to John to refrain from causing John to make imprudent investments. Morgan, knowing John's investment objectives, had a duty to refrain from persuading John to make investments which were not suitable for his needs or objectives. In evaluating whether or not such investments were suitable, this Court has carefully considered the testimony of Slocum, Coleman and defendant Morgan.

It is interesting to note that despite the fact that John contends that the investments made by Morgan were not suitable for him considering his expressly stated goals and objectives, the evidence introduced, including John's own testimony, would seem to contradict this. Slocum testified that while he did not believe long-term municipal bonds were appropriate for John, he acknowledged that if the bonds returned to par and the investor chooses not to get into something else "it's his money, he can do as he wishes". John testified at Campbell's trial[3] that "if I could sell them for $600,000 today, they would be good bonds." (Exhibit 239). Cole testified in November, 1988, that the bonds were approximately at par. John testified during this trial (November, 1988), that he would not accept "today" $600,000 for these bonds.

The Court does not mean to suggest that the above would preclude John from recovering if this Court was satisfied that defendant Morgan engaged in improper conduct that was a proximate cause of a loss suffered by John. It does, however, impact on John's credibility with reference to his claim that these bonds were not "suitable" for his needs and objectives.

Defendant Morgan's conduct is not to be evaluated by "hindsight". An investment may turn out to be an unwise choice (although as previously indicated "hindsight" may prove that Morgan's decision was not unwise since John has received the additional tax-free interest which accompanies long-term bonds—approximately 1½—2% higher than short-term bonds—his desired goal and that such bonds were approximately at the original value in November, 1988.) Rather, Morgan's conduct is to be judged based on the information possessed by him at the time he made the recommendations to John. In this Court's opinion, based on the evidence introduced in this trial, the investment in long-term municipal bonds was not an unreasonable investment for John. While there were some risks accompanying such investment, there was also the added advantage of greater tax-free income. Testimony might support the conclusion that there were "better" investments available for plaintiff at that time. Certainly Slocum believes that John's assets could have been better invested to accomplish his objectives. But this Court is satisfied that the philosophy held by Morgan was a philosophy held by other knowledgeable investment counselors and/or stockbrokers, i.e., that long-term municipal bonds, were a prudent investment for an individual of John's means and to accomplish John's objectives. In sum, this Court does not find that such investment was unsuitable, unreasonable nor was it, in any way, a breach of a fiduciary duty for Morgan to recommend such investment.

Plaintiffs contend that Morgan acted improperly in effecting the "tax swaps". Essentially, plaintiffs contend that Morgan could have effected "tax swaps" in a different manner which would have better suited

---

**3.** Reference is to testimony before the Honorable George E. Woods in the trial of *Campbell v. Shearson/American Express Inc., et al.,* Case No. 82–70594 conducted in June, 1985. (Part of Exhibit 239)

John's objectives. Plaintiffs have failed to persuade this Court, by a preponderance of the evidence, that any activity with regard to the "tax swaps" was improper; furthermore such conduct did not proximately cause any loss to John. Again we have an "expert", (Slocum) who, with the benefit of "hindsight", suggests that the "swaps" could and should have been done differently, and in his opinion, had they been done differently as he suggests, John would have been better off. While it may be that such "tax swaps" could have been done differently, this Court is not persuaded that the method used by Morgan was in any way improper or in any way breached any statutory or common law duty, owing to John. Defense witness E. John Galley, who has extensive experience in municipal bond trading and in the valuation of bonds testified that he found nothing wrong with the "tax swaps".[4] Defense witness Coleman also testified that he found nothing improper about the manner in which the "tax swaps" took place. In this Court's opinion, such "tax swaps" were done in a reasonable manner and accomplished the intended objective *i.e.,* tax losses without adversely affecting, to any significant degree, John's investment. The adverse effect on John's investment was caused by the market conditions—the same conditions which permitted John to take advantage of the tax loss.

### Conclusions of Law
### Breach of Fiduciary Duty

█ Defendant Morgan had a duty of "utmost good faith" and he had a duty to fully and fairly disclose all material facts as well as an affirmative obligation to employ reasonable care to avoid misleading John. *S.E.C. v. Capital Gains Research Bureau,* 375 U.S. 180, 194, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963); *S.E.C. v. Blavin,* 760 F.2d 706, 711 (6th Cir.1985). He also had a duty under federal and state security laws to avoid making misrepresentations of material facts and a duty not to omit material facts which should be dis-

4. See for example Galley's testimony at p. 53 of his *de bene esse* deposition submitted as part of

closed. In this regard, the testimony supports a conclusion that an individual in the capacity of Morgan had a duty to "know" his customer", *i.e.* to know the customer's tax situation, the customer's financial situation, e.g. the likelihood that he will have a need to liquidate his investments, and to know the client's investment objectives.

█ The evidence introduced fails to persuade this Court that Morgan breached any fiduciary duty owed to the plaintiffs; further, this Court does not find that any conduct on the part of Morgan, either by way of affirmative statements or by way of omissions, was a proximate cause of any injury to the plaintiffs.

### Violation of Section 10(b) and Rule 10b–5

In order to recover a claim pursuant to Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b–5 (17 C.F.R. § 240.10b–5 (1988), plaintiff must prove a misstatement or omission of a material fact, made with scienter, on which the plaintiff relied, and that proximately caused his injury. *Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir.1981), *reversed in part and affirmed in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

█ The "scienter" requirement is met if the misrepresentation or omission is done knowingly, or with recklessness. Recklessness is highly unreasonable conduct which is an extreme departure from the standards of ordinary care. *Blavin, supra,* at 711.

Under the circumstance of a case involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of the investment decision. *Affiliated Ute Citizens of Utah v. United States, States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972).

Exhibit 239.

*Violation of State Securities Law*

M.C.L.A. § 451.810(a)(2) imposes liability on a person who

> Offers or sells a security or commodity contract by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

This Court concludes that Morgan did not misrepresent any material fact to John nor did he fail to disclose any material fact which should have been disclosed. Furthermore, this Court finds that Morgan did not act with the scienter specifically required for a violation of § 10(b) of the federal securities law.

*Common Law Fraud*

The Michigan Supreme Court in *Hi–Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813 (1976) set forth the elements of common law fraud or misrepresentation as follows:

> The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery.

*Hi–Way Motor Co.* at 336, 247 N.W.2d 813. The Court further explained:

> The burden of proof rests with plaintiffs. Fraud will not be presumed but must be proven by clear, satisfactory and convincing evidence.

*Ibid.* See also *Disner v. Westinghouse Elec. Corp.*, 726 F.2d 1106 (6th Cir.1984).

This Court is not persuaded "by clear and convincing evidence" that Morgan misrepresented any material fact, nor did he fail to disclose any material fact which should have been disclosed. Furthermore, this Court does not find that he made (or omitted) any statements with knowledge of their falsity or in reckless disregard of its truth.

*Innocent Misrepresentation*

In *United States Fidelity & Guaranty Co. v. Black*, 412 Mich. 99, 313 N.W.2d 77 (1981), the Michigan Supreme Court described the requirements of an innocent misrepresentation claim:

> "[W]here an action is brought to recover for false and fraudulent misrepresentations made by one party to another [1] in a transaction between them, [2] any representations which are false in fact [3] and actually deceive the other, and [4] are relied on by him to his damage, are actionable, irrespective of whether the person making them acted in good faith in making them, [5] where the loss of the party deceived inures to the benefit of the other."

*Id.* at 116, 313 N.W.2d 77, *quoting Phillips v. General Adjustment Bureau*, 12 Mich. App. 16, 20, 162 N.W.2d 301 (1968).

Defendant Morgan did not make any representations which were "false in fact". This Court further concludes that none of the "representations" by Morgan were a proximate cause of any injury to the plaintiffs.

*Negligence*

An agent has a duty to his principal to act with the standard of care and with the skill that is standard in the locality for the kind of work which he is employed to perform and in addition, to exercise any skill that he has. *Restatement (Second) of Agency*, § 379.

Plaintiffs have failed to prove by a preponderance of the evidence that Morgan failed to exercise the degree of care that he was required to exercise under the circumstances existing at the time, including of

course, his fiduciary relationship to the plaintiffs.

### Summary

In summary, this Court believes that Morgan did not act improperly in recommending long-term municipal bonds for John; that he did not intentionally or recklessly deceive John by failing to disclose the extent of the potential fluctuations of the value of the bonds; and that if John wasn't aware at the time of the initial investment of $300,000 of the potential for significant fluctuation of the value of municipal bonds, he was aware of such fluctuations before 1980 when he learned of the losses from his accountant. John never chose to extricate himself from the market even after he learned (though he claims otherwise) of the substantial fluctuations of the bonds, *i.e.*, the "risk" accompanying bonds. This Court finds that both John and Morgan believed that the principal amount of these bonds would be present at such time as John would choose to dispose of them (and certainly at maturity) and that in the meantime, such bonds would fulfill John's long-term goal of providing him with substantial tax-free income.

■ The Court further finds that John has not suffered any real loss because as of the time of trial the market value of the bonds was equal to or exceeded the $600,000 he paid for such bonds as evidenced by the testimony of Cole and by John's indication that he would not accept $600,000 for the bonds in November, 1988.

■ To the extent that plaintiffs can be contrued to have suffered a loss, such loss was not a proximate result of any wrongful conduct on the part of Morgan but rather was the result of the unusual market conditions that existed in 1979–1981 caused by inordinately high inflation and historic interest rates.

### Loss of Interest

■ Plaintiffs contend that John is entitled to $22,000 in interest which he lost as a result of the "tax swaps". This Court is satisfied that John consented to these "tax swaps" to achieve desired tax losses and that there was no illegal, improper, or wrongful conduct on the part of Morgan which was a proximate cause of any loss of interest to John.

### Loss of Commissions

■ John testified that in discussing the "tax swaps" with Morgan, he was led to believe that they would cost $150 for the paperwork. He later testified that he was told that he would have to pay $150 for each of the transactions. Contrary to his impression as to the costs of the "tax swaps", he was in fact, charged $24,000. While this Court does not find that there was any intent on Morgan's part to deceive John with regard to the cost of these transactions (because at some point it would become apparent what the actual costs were), nevertheless, this Court believes that Morgan unintentionally led John to believe that the costs involved in these "tax swaps" would be minimal. The Court further finds that Morgan led John to believe that these "tax swaps" were routine transactions and in obtaining John's consent to participate in these "tax swaps", caused John to believe that the costs involved would not exceed $150 per transaction. The Court finds that an agreement was reached between John and Morgan as to the costs of these "tax swaps", and that the agreement was that they would not exceed $150.00 per transaction.

The Court does not believe that the defendants are entitled to the $24,000 in commissions. Rather, such defendants are entitled to compensation at the rate of $150 for each of the 24 transactions, or $3,600. Plaintiffs are therefore entitled to recover from defendants the sum of $20,400. It is not clear that plaintiffs have expressly asserted a "breach of contract" claim with regard to these commissions. The Court does believe that the plaintiffs have, through the testimony offered, asserted that Morgan agreed that only $150 per transaction would be charged. The Court therefore awards the plaintiff the sum of $20,400 as a result of defendants' breach of its agreement with plaintiff. (If plaintiffs have not properly set forth a breach of

contract claim with regard to the commissions, the Court would arrive at the same result under plaintiff's "negligent misrepresentation" theory.)

For the reasons set forth above, the Court does hereby award plaintiffs the sum of $20,400 on plaintiffs' claim for excessive commissions paid to defendant. The Court does enter a verdict in favor of defendants as to all other claims asserted by plaintiffs.

A judgment reflecting the above shall be entered forthwith.