COWEN, dissenting
 

 The District Court certified the following question for interlocutory appeal:
 

 Can Defendants be potentially liable under Section 11 of the Securities Act of 1933, each as a "person performing similar functions" to a director, in light of Defendants' role as board observers who could (but did not necessarily have to) significantly influence the outcome of matters submitted to the board of directors for approval?
 

 (2/21/18 Order at 2.) Because I agree with the District Court that this question must be answered in the affirmative, I respectfully dissent.
 

 I do not really take issue with the basic definitions of "director" and "similar" offered by the majority, although I do reject its application of these concepts. "[I]n a more specialized sense related to business organizations, ['director'] could mean '[a] member of a board appointed to direct or manage the affairs of a commercial corporation or company.' [
 
 Director
 
 , Oxford English Dictionary 392 (1st ed. 1933) ];
 
 see
 

 Directors
 
 , Black's Law Dictionary 581 (3d ed. 1933) (defining 'director' as a 'person[ ] appointed or elected according to law, authorized to manage and direct the affairs of a corporation or company')." (Majority Opinion at 184.) The District Court likewise "defines 'director' as [inter alia] '[a] person appointed or elected to sit on a board that manages the affairs of a corporation or other organization by electing and exercising control over its officers.' "
 
 Dartell v. Tibet Pharms., Inc.
 
 , Civil Action No. 14-3620,
 
 2017 WL 1944106
 
 , at *9 (D.N.J. May 10, 2017) (footnote omitted) (quoting
 
 Director
 
 , Black's Law Dictionary (10th ed. 2014)). In general, the term "similar" is "most aptly defined as '[h]aving a marked resemblance or likeness; of a like nature or kind' " (
 
 id.
 
 at 186 (quoting
 
 Similar
 
 , Oxford English Dictionary 59 (1st ed. 1933))).
 
 See, e.g.
 
 ,
 

 id.
 

 ("The Court will also apply the ordinary meaning of 'similar,' which is defined as 'having characteristics in common.'
 
 See
 

 Similar
 
 , [Merriam-Webster Dictionary] (2016).").
 

 Even if Section 11(a)(3) of the Securities Act thereby requires more than some slight similarity, the majority fails to recognize the expansive scope of this "similar"
 

 language. Congress chose to use this word instead of the terms "identical" or the "same"-or even "essentially identical" or "essentially the same." We should honor Congress's choice of such language, which the majority acknowledges could encompass varying degrees of likeness. According to the majority, "[t]he question is rather whether they possess at least some of the core powers and responsibilities that define corporate directorship under the law of corporations." (
 
 Id.
 
 at 186 (footnote omitted).) However, the statutory language plainly requires that the individual merely perform functions "similar" to, i.e., " 'of a like nature or kind' " as (
 
 id.
 
 at 186 (quoting
 
 Similar
 
 , Oxford English Dictionary 59 (1st ed. 1933))), the functions of a director. The majority's approach actually resembles the formulation set forth by the British Companies Act of 1929, which defines "director" as including "any person occupying the position of director by whatever name called." (JA818 (comparing statutory language).) Although the Securities Act was modeled on the British Companies Act,
 
 see, e.g.
 
 ,
 
 Gustafson v. Alloyd Co.
 
 ,
 
 513 U.S. 561
 
 , 599,
 
 115 S.Ct. 1061
 
 ,
 
 131 L.Ed.2d 1
 
 (1995) (Ginsburg, J., dissenting), Congress did not follow Parliament's "director by whatever name called" approach. It instead adopted what could only be considered a more sweeping "similar" formulation.
 

 More broadly, the Court should not overlook the purposes of the 1933 Securities Act as well as Section 11 in particular. The "basic purpose" of this legislation was "to provide greater protection to purchasers of registered securities."
 
 Herman & MacLean v. Huddleston
 
 ,
 
 459 U.S. 375
 
 , 383,
 
 103 S.Ct. 683
 
 ,
 
 74 L.Ed.2d 548
 
 (1983). Section 11 was then "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."
 

 Id.
 

 at 381-82
 
 ,
 
 103 S.Ct. 683
 
 (footnotes omitted). Admittedly, Section 11 actions (which, as the District Court acknowledged, implicate virtually absolute liability) can only be brought against certain defendants (which do not include, for example, corporate officers other than as specified).
 
 See, e.g.
 
 ,
 

 id.
 

 at 382 & n.13, 386 n.22,
 
 103 S.Ct. 683
 
 . Nevertheless, Section 11 still encompasses a wide range of defendants, including every person who signed the registration statement; every person who was a director of (or person performing similar functions) or partner in the issuer at the time of filing; every accountant, engineer, appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation used in connection with the registration statement, with respect to the statement in such document, which purports to have been prepared or certified by him; and every underwriter with respect to such security. The Supreme Court has "repeatedly recognized that securities laws combating fraud should be construed 'not technically and restrictively, but flexibly to effectuate [their] remedial purposes.' "
 

 Id.
 

 at 386-87
 
 ,
 
 103 S.Ct. 683
 
 (quoting
 
 SEC v. Capital Gains Research Bureau
 
 ,
 
 375 U.S. 180
 
 , 195,
 
 84 S.Ct. 275
 
 ,
 
 11 L.Ed.2d 237
 
 (1963) ). We should thereby specifically consider whether the defendant is named in the registration statement as being or about to become a person performing similar functions to a director with respect to the drafting, publication, or accuracy of the registration statement itself. Furthermore, "Plaintiffs point to two Exchange Act SEC interpretive releases they say suggest a broader definition." (Majority Opinion at 185 n.6 (citing
 Ownership Reports & Trading by Officers, Directors & Principal Sec. Holders, Exchange Act Release No. 17991,
 
 1991 WL 292000
 
 (Feb. 21, 1991); Interpretive Release on Rules Applicable to Insider Reporting & Trading, Exchange Act Release No. 18114,
 
 1981 WL 31301
 
 (Sept. 24, 1981) ). "Those releases say a person's title should not determine 'whether an advisory, emeritus or honorary director is a director for Section 16 purposes,' Release No. 17991,
 
 1991 WL 292000
 
 , at *4, and that the focus should instead be on whether the person performs duties likely to make him privy to inside information,
 
 see
 

 id.
 
 ; Release No. 18114,
 
 1981 WL 31301
 
 , at *5 & n.15." (
 
 Id.
 
 ) While these releases implicate the Exchange Act and access to inside information, they certainly are consistent with the expansive statutory language and legislative purposes at issue in this appeal. In fact, the majority looks elsewhere in its opinion to "the Exchange Act definition of director" (
 
 id.
 
 at 184 (quoting 15 U.S.C. § 78c(a)(7) )), and Defendants likewise rely on the SEC's interpretation.
 

 Accordingly, a person may be named as performing similar functions to a director even if he or she does not possess the directors' "formal power to direct and manage a corporation, and the responsibilities and duties that accompany those powers" (
 
 id.
 
 at 185 (footnote omitted)). On the contrary, he or she is a person named in the registration statement as being or about to become a person performing similar functions if, pursuant to this statement, he or she possesses powers or abilities that are of a like nature or kind as the power to direct or manage the affairs of the corporation. As the District Court aptly explained, "a defendant may be held liable if he had the ability to exercise similar control and management as a director when the registration statement at issue was filed or was named as about to assume such a role in the registration statement, even if the corporation at issue also had a board of directors or persons about to be named directors."
 
 Dartell
 
 ,
 
 2017 WL 1944106
 
 , at *9. Applying this approach to the Tibet registration statement, I have no difficulty concluding that Zou and Downs are proper Section 11(a)(3) defendants.
 
 [1]
 

 "[T]he registration statement explained 'they [Zou and Downs] may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval.' " (
 
 Id.
 
 at 181-82 (quoting JA178).) Specifically, the "
 
 Management
 
 " section of the statement (JA226) included a subsection addressing the "
 
 Relationship with our Placement Agent"
 
 :
 

 In connection with this offering, we have agreed to allow our Placement Agent to designate two non-voting observers to our Board of Directors until the earlier of the date that:
 

 • The investors that purchase shares in this offering beneficially own less than 5% of our outstanding shares; or
 

 • The trading price per share is at least $ 24 per share for any consecutive 15 trading day period.
 

 It is anticipated that Mr. Downs, our Placement Agent's Senior Vice President, and Mr. Hayden Zou will serve as the Placement Agent's observers to our Board of Directors.
 

 Although our placement agent's observers will not be able to vote, they may nevertheless influence the outcome of matters submitted to the Board of Directors for approval. We have agreed to reimburse the observers for their expenses for attending our Board meetings, subject to a maximum reimbursement of $ 6,000 per meeting and $ 12,000 annually, which amount is not more than the reimbursement payable to our directors. The observer will be required to certify that such travel expenses are not reimbursed by any other party. We will also pay observers the same amount as our independent directors receive.
 

 (JA230.) A similar subsection was included as part of the
 
 "RISK FACTORS
 
 " discussion (JA152):
 

 We will have an ongoing relationship with our Placement Agent that may impact our shareholders' ability to impact decisions related to our operations.
 

 In connection with this offering, we have agreed to allow our Placement Agent to designate two non-voting observers to our Board of Directors until the earlier of the date that:
 

 (i) the investors that purchase shares in this offering beneficially own less than five percent (5%) of our outstanding shares; or
 

 (ii) the trading price per share is at least four (4) times the offering price for any consecutive 15 trading day period.
 

 Although our Placement Agent's observers will not be able to vote, they may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval. We have agreed to reimburse the observers for their expenses for attending our Board meetings, subject to a maximum reimbursement of $ 6,000 per meeting and $ 12,000 annually, which amount is not more than the reimbursement payable to our directors. The observer will be required to certify that such travel expenses are not reimbursed by any other party. We will also pay observers the same amount as our independent directors receive. As of the date of this prospectus, Mr. L. McCarthy Downs III and Mr. Hayden Zou are serving as our Placement Agent's observers to our
 Board of Directors. See "Management - Board of Directors Observer."
 

 (JA178.)
 

 According to the majority, there are three features differentiating Defendants from directors: (1) "First, and most fundamentally, Zou and Downs cannot vote for board action" while individual directors direct and manage company affairs by means of formal voting (Majority Opinion at 189); (2) they are aligned with the placement agent as opposed to Tibet and its shareholders; and (3) their tenures are set to end automatically without any opportunity for the shareholders to vote them out. There are some obvious differences between observers as described by the registration statement and directors (after all, even the registration statement acknowledged Defendants' inability to vote), and I agree with the District Court that "simply being named a board observer did not open Downs or Zou up to Section 11 liability because the title does not indicate that such a position necessarily performs similar functions to a director,"
 
 Dartell
 
 ,
 
 2017 WL 1944106
 
 , at *10. However, the registration statement went beyond merely identifying two non-voting board observers. It also indicated that: (1) most importantly, Defendants may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval; (2) Defendants are aligned with the placement agent in exercising this significant influence over Board action-serving as the placement agent's own "eyes and ears at Board meetings" as Defendants put it (Appellants' Reply Brief at 12 (footnote omitted))-and could not be voted out by the shareholders; (3) in order to observe and exercise their significant influence, Defendants implicitly have the right to inside information, to attend meetings of the Board of Directors, and to speak or otherwise share their opinions; and (4) Defendants are entitled to the same pay as "our independent directors receive" (JA178, JA230) and (like the members of the Board of Directors) are also eligible for reimbursement for attending Board meetings (although their reimbursement is capped).
 

 Given the plain language of the registration statement, Defendants are clearly named as possessing powers or abilities that are of a like nature or kind as the directors' power to direct or manage the affairs of the corporation:
 

 The prospectus does not define any of the words used to describe the Board Observers' role. As a result, the Court turns to dictionary definitions. First, the statement indicates that Board Observers would have the ability to influence the Tibet Board. "Influence" is defined as "the power or capacity of causing an effect in indirect or intangible ways."
 
 Influence
 
 , [Merriam-Webster Dictionary] (2016). Next, the description provides that this influence would be significant. "Significant" means "of a noticeably or measurably large amount."
 
 Significant
 
 , [Merriam-Webster Dictionary] (2016). Thus, the language "significantly influence" indicates that the two Board Observers could play a critical role in board decisions.
 

 Id.
 
 at *10. In fact, the registration statement "does not place a limit on whom or what they may influence,"
 
 id.
 
 , and Defendants' thereby may "significantly" influence the outcome of all matters submitted to the Board-which, according to the statement, "makes all relevant [Tibet] decisions" (JA229). In turn, "our Placement Agent's observers" were appointed "[i]n connection with this offering" (JA178, JA230), indicating that Defendants' capacity for significant influence is linked to the public offering itself.
 
 See, e.g.
 
 ,
 
 Herman & MacLean
 
 ,
 
 459 U.S. at 381-82
 
 ,
 
 103 S.Ct. 683
 
 (observing that Section 11 was "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering" (footnotes omitted)). Furthermore, similar compensation points to similarity in functions. After all, compensation (at least theoretically) reflects the sort of work the individual has performed.
 

 According to the majority, "[t]hat Zou and Downs, as nonvoting observers, 'may' influence board decisions is not a grant of power at all." (Majority Opinion at 191.) It compares Defendants to a hypothetical investment analyst for a research firm, who might (or might not) have special access to the issuer's board of directors and management, power to influence the board based on the analyst's reputation and influence in the industry, and whose "influence-his power to persuade-might even 'impact [the issuer's] shareholders' ability to impact decisions related to [its] operations' " (
 
 id.
 
 at 189 (quoting JA178)). However, we do not-and should not-decide whether this imaginary analyst is named as being or about to become a director or a person performing similar functions. In any event, there is no indication that the analyst resembles "our Placement Agent observers" (JA230) and is entitled to similar compensation as the directors. The majority continues to insist that Section 11(a)(3) "includes only persons who, on the face of the registration statement, exercise formal power similar to directors" (Majority Opinion at 186 n.6)-even though someone need not have any "formal powers" to perform similar functions under Section 11(a)(3). In fact, influence is itself a form of power, defined as "
 
 the power or capacity
 
 of causing an effect in indirect or intangible ways."
 
 Influence
 
 , Merriam-Webster Dictionary (2016) (emphasis added). Under the plain language of the registration statement, such "significant" power over the outcome of matters submitted to the Board of Directors for approval is of a like nature or kind to the formal powers that directors possess to direct and manage the company's affairs. In fact, Defendants may have more real power than the nominal members of the Board of Directors. The majority recognizes that directors act as a board and that it is the board of directors that manages the corporation's affairs. In short, an individual director or group of directors may vote and lose on matters submitted to the Board for approval and thereby fail to influence the outcome of such matters while Defendants "may nevertheless significantly influence the outcome of [the] matter[ ]" (JA178). In such circumstances, the statutory language and purpose plainly mandate holding such individuals liable under Section 11(a)(3).
 
 [2]
 

 For the foregoing reasons, I would affirm the District Court's denial of summary judgment.
 
 [3]
 

 I agree with the majority that, in considering a claim under Section 11(a)(3), we must look to what is actually stated in the registration statement (as opposed to the defendant's real-world actions). I, however, do not agree that "whether one is a proper defendant under § 77k(a)(3) is a question of law for the court, not a question of fact for the jury." (Majority Opinion at 186.) While judges often do construe written instruments, there are some clear exceptions. For example, if a contract is susceptible to multiple reasonable interpretations, the contract is ambiguous, and the jury is tasked with resolving that ambiguity.
 
 See, e.g.
 
 ,
 
 Baldwin v. Univ. of Pittsburgh Med. Ctr.
 
 ,
 
 636 F.3d 69
 
 , 76 (3d Cir. 2011) ;
 
 Ram Const. Co. v. Am. States Ins. Co.
 
 ,
 
 749 F.2d 1049
 
 , 1052 (3d Cir. 1984). The whole concept of similarity also appears to trigger the sort of open-ended factual assessment that a jury would usually be expected to undertake, i.e., deciding whether something is more or less "similar" to something else and whether this similarity is enough to satisfy the statutory scheme. In this case, Zou "was an early investor in Tibet and the sole director of [China Tibetan], a wholly owned subsidiary of Tibet." (
 
 Id.
 
 at 181.) "Tibet's ability to control Yunnan flowed through China Tibetan." (
 
 Id.
 
 ) It was Zou who told the placement agent and Downs about Tibet, and the two Defendants "then worked together to bring Tibet public." (
 
 Id.
 
 ) Zou opened China Tibetan's HSBC Hong Kong bank account, and his name remained on the account. Defendants insist that Zou's name was supposed to be removed, he did not make any withdrawals or transfers into or out of the China Tibetan account, Tibet's CEO and its cashier had complete control over the account, and Tibet had full control over the IPO proceeds, which were deposited into another account held by Tibet. However, more than $ 4 million was deposited into China Tibetan's account just two days after the proceeds were transferred to Tibet's HSBC Hong Kong account, and approximately $ 3.5 million in cash was then withdrawn from the China Tibetan account less than a month later. In any event, I believe that Plaintiffs prevail even if the present inquiry is characterized as a question of law for the courts to decide.
 

 I also am not persuaded by the other arguments raised by the majority opinion, including the case law it cites. In
 
 First Liberty Investment Group v. Nicholsberg
 
 ,
 
 145 F.3d 647
 
 (3d Cir. 1998), this Court did not consider whether a defendant was named as being or about to become a person performing similar functions as a director. Instead, it "applied a phrase in a National Association of Securities Dealers arbitration provision" (Majority Opinion at 190) and, in any event, "held a purportedly independent contractor 'perform[ed] similar functions' to those of a 'branch manager' of a broker-dealer" (
 
 id.
 
 (quoting
 
 First Liberty
 
 ,
 
 145 F.3d at
 
 651-52 )). Applying a state blue sky statute, the Sixth Circuit explained that "Clayton offered no facts on summary judgment from which we could infer that Durham did anything beyond what would be expected of a securities attorney providing run-of-the-mine legal services."
 
 Bennett v. Durham
 
 ,
 
 683 F.3d 734
 
 , 738 (6th Cir. 2012) ("Clayton's brief on appeal seeks to add more, but the effort is too little and too late."). The district court decisions, in turn, read the statutory language too narrowly, taking it to mean persons performing the same functions as directors while shunning the directorial title.
 
 See, e.g.
 
 ,
 
 Mersay v. First Republic Corp. of Am.
 
 ,
 
 43 F.R.D. 465
 
 , 469 (S.D.N.Y. 1968) ;
 
 Lockheed Aircraft Corp. v. Rathman
 
 ,
 
 106 F. Supp. 810
 
 , 812 (S.D. Cal. 1952). Finally, I note that Defendants have failed to argue that they never consented to be named in the registration statement.
 

 Defendants also assert that Section 11(a)(3), at least as interpreted by the District Court and Plaintiffs, would be unconstitutionally vague as applied to them. Given my analysis of this statutory provision, I do not agree that it " 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.' "
 
 Papachristou v. City of Jacksonville
 
 ,
 
 405 U.S. 156
 
 , 162,
 
 92 S.Ct. 839
 
 ,
 
 31 L.Ed.2d 110
 
 (1972) (quoting
 
 United States v. Harriss
 
 ,
 
 347 U.S. 612
 
 , 617,
 
 74 S.Ct. 808
 
 ,
 
 98 L.Ed. 989
 
 (1954) ).